## JEFF VANN, ALIAS JEFF VANCE, v. THE STATE.

No. 2759.   Decided December 16, 1903.

### 1.—City Charter and Ordinances.

A city ordinance which is authorized by the charter, prohibiting hack drivers, hotel runners and kindred classes of people from taking their stand at a certain place for the purpose of soliciting passengers who arrive on the different railway trains, and which authorized policemen to arrest without warrant when a violation of such ordinance occurred within their view, is valid.   Davidson, Presiding Judge, dissenting. ·

### 2.—Charge of Court—Manslaughter—Self-Defense.

See state of facts where court should have charged on manslaughter, as well as self-defense, unfettered by a charge on provocation with the apparent intention to kill.

### 3.—Arrest—Officer's Conduct.

When an officer has a right to arrest, and the killing grew out of such arrest, the act of the officer in making the arrest must not have been in a threatening and menacing manner, and if the officer was acting in violation of law, the person whom he was so attempting to arrest could resist him if necessary to save his own life to the extent of taking the officer's life.

#### 4.—Same—Manslaughter—Charge of Court.

If appellant shot the deceased officer under circumstances which rendered his mind incapable of cool reflection, upon adequate cause, he would not be guilty of any higher offense than manslaughter, and the court should have so instructed the jury.

#### 5.—Charge of Court—Burden of Proof.

A charge of the court which instructs the jury that if they did not believe from the evidence that deceased was in good faith attempting to arrest defendant, shifts the burden of proof and is erroneous.

#### .6.—Same—Self-Defense.

Where the evidence raises the issue of self-defense, the court should charge upon the law of self-defense, without restricting its charge by the law of provoking the difficulty, and it was flagrant error to refuse a special charge correcting such general charge. ·

#### 7.—Same—Reasonable Doubt.

A charge which required the jury to find affirmatively that appellant did not provoke the difficulty, and that deceased had no lawful authority to arrest defendant, and that defendant knew this, before they could acquit, or reduce defendant's crime below that of murder, and without coupling such charge with the principle of reasonable doubt, is erroneous.

#### 8.—Same—Provoking Difficulty.

The court in charging on the law of provoking the difficulty should have instructed the jury that defendant must have said or done something which produced the occasion or brought about and provoked the difficulty.

#### 9.—Same—Illegal Arrest—Self-Defense.

Independent of appellant's right to an instruction on self-defense growing out of his theory of illegal arrest, he was entitled under the facts to a charge of self-defense, without such qualification, nor should such charge have been fettered by an instruction on the relative strength of the parties.

#### 10.—Evidence—Res Gestae.

Where, at the termination of the difficulty, two officers seized defendant and it is left in doubt when he fired the last shot, whether while they held him or immediately before they seized him, and he made a statment about that . time with reference to the homicide, the same is res gestae and admissible.

#### 11.—Impeachment of Witness.

An answer of a witness to the opinion of another witness can not be the subject for impeachment.

Appeal from the District Court of Tarrant.    Tried below before Hon. Irby Dunklin.

Appeal from a conviction of murder in the. first degree; penalty, death.

The opinion states the case fully upon the questions decided.

*J. M. Hurt, Wynne & McCart,* and *Bowlin & M'Cart,* for appellant. On the question of arresting appellant without warrant, and the invalidity of the charter authorizing arrests without warrant, when not allowed by the State law, the court's attention is directed to the case of Arroyo v. State, 68 S. W. Rep., 995, where all the analogous cases are cited. See also Mundine v.. State, 37 Texas Crim. Rep., 5; 38 S. W. Rep., 619. See White's Code Crim. Proc., title 5, p. 147, et seq., that where an arrest is attempted, the officer should state his purpose and the reason for making the arrest, the offense for which same was being made, etc. See Code Crim. Proc., art. 278; Cabell v. Arnold, 86 Texas, 102; 23 S. W. Rep., 645; Penal Code, art. 661, and notes; Code Crim. Proc., art. 247 et seq.

The court erred in permitting the State's witness J. J. Fulford to testify to a conversation had with the defendant after he had been arrested and was in custody of the policeman, Joe Witcher. Appellant contends that the doctrine of res gestae, even if such evidence in this case should be considered as res gestae, does not apply to a person under arrest. White's Code Crim. Proc., art. 790, and cases cited in sec. 1023, and especially Moralis v. State, 36 Texas Crim. Rep., 234; 36 S. W. Rep., 435.

The court erred in permitting the State to prove by the witness Judkins a conversation Judkins claims to have had with witness Batis to the effect that he, Judkins, a few minutes after the killing, stated to witness Batis "that it was a shame to kill a man that way," and Batis' reply thereto. Drake v. State. 29 Texas Crim. App., 265; 15 S. W. Rep., 725; Wells v. State, 67 S. W. Rep., 1020.

On the proposition that the evidence did not justify the court in submitting the doctrine of provoking the difficulty, etc., see notes of Judge White, being sec. 181, Ann. Penal Code, p. 418 et seq., and cases cited in sec. 1182, p. 420. On repetition in charge, White's Ann. C. C. P., sec. 821, and the cases cited in notes, and especially Bonner v. State, 25 Texas Crim. App., 173; 7 S. W. Rep., 861; Erwin v. State, 20 Texas Crim. App., 12; Wyers v. State, 22 Texas Crim. App., 258; 2 S. W. Rep., 722; Morgan v. State, 29 S. W. Rep., 1082.

In this case appellant was entitled under the evidence to a charge upon the law of manslaughter. The evidence tending to show "adequate cause" established a number of conditions and circumstances which, either singly or collectively, may have constituted what the jury might have considered "adequate cause." First, the deceased had no lawful authority to arrest appellant, therefore the arrest was illegal. Second, that if the arrest was not illegal then the deceased was exercising the right to arrest in a violent and unlawful manner. Third, that deceased was not attempting to arrest appellant in good faith because he had violated the hack ordinance in question, but that he was attempting to arrest him, appellant, for the purpose of humiliating appellant or for the purpose of revenge on account of insulting language used by appellant to him, deceased; and, fourth, which was the most important issue to appellant, and was clearly raised by his individual evidence, that deceased was in fact not trying to arrest him at all, but was trying to make him retract abusive language that he had used to him, deceased.

Appellant's special charge on self-defense:

"You are charged, gentlemen of the jury, that if defendant had violated the ordinance in evidence, in the presence of deceased, as a violation of the same has been defined to you, and that the defendant only evaded, or attempted to evade or avoid, being arrested and that deceased attempted to arrest him in such a wanton and menacing manner, and by resort to the use of a deadly weapon or pistol, before defendant had offered to use or attempted to use a pistol against deceased, and that such

acts and conduct of deceased were such as to threaten defendant with loss of life or bodily harm, then the defendant had the right even though such attempt to arrest was legal, to defend himself against the unlawful use, or attempted use of a pistol by deceased, and if in so doing he shot and killed deceased, he would be justifiable, and if you so believe and find from the evidence, you will find the defendant not guilty." Bartay v. State, 67 S. W. Rep., 416; Miers v. State, 29 S. W. Rep., 1074; English v. State, 30 S. W. Rep., 234; Miller v. State, 20 S. W. Rep., 1103; Miller v. State, 21 S. W. Rep., 925; Harder v. State, 49 S. W. Rep., 607; Tiner v. State, 44 Texas, 128; Caldwell v. State, 41 Texas, 86; Goodman v. State, 4 Texas Crim. App., 349; Johnson v. State, 5 Texas Crim. App., 43; Johnson v. State, 44 Texas, 314; Code Crim. Proc., art. 276; Giroux v. State, 40 Texas, 98; Beaverts v. State, 4 Texas Crim. App., 175; Skidmore v. State, 43 Texas, 93; Jones v. State, 26 Texas Crim. App., 1; 9 S. W. Rep., 53; Siedel v. State, 28 Texas Crim. App., 153; 12 S. W. Rep., 591; Carter v. State, 30 Texas Crim. App., 551; 17 S. W. Rep., 1102; Read v. State, 11 Texas Crim. App., 509.

The court erred in not charging the jury what facts they could consider in determining whether or not defendant provoked the difficulty in question, and in not defining their effect and bearing upon the cause, and to what extent such acts would be an abridgment of defendant's right of self-defense, thus leaving the jury to speculate and deliberate as to the nature and quality of the facts they were to consider, and as to what extent they would abridge the defendant's right of self-defense. Morgan v. State, 29 S. W. Rep., 1092; 34 Texas Crim. Rep., 222; Williams v. State, 69 S. W. Rep., 415; Franklin v. State, 30 Texas Crim App., 628; 18 S. W. Rep., 468; Cartwright v. State, 14 Texas Crim. App., 89; Cunningham v. State, 17 Texas Crim. App., 89; Carter v. State, 35 S. W. Rep., 378; Franklin v. State, 34 Texas Crim. Rep., 286; 30 S. W. Rep., 231; see also secs. 1181, 1182, White's Ann. Penal Code.

*Howard Martin*, Assistant Attorney-General, and *O. S. Lattimore*, County Attorney, Tarrant County, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant (a hack driver) was convicted for the murder of A. J. Grimes (a policeman), and his punishment assessed at death. The statement of facts discloses that appellant had been arrested two or three times by deceased for violating the hack ordinance. By virtue of one of these arrests, under the writ of habeas corpus, this hack ordinance was declared void. These matters engendered some ill feeling between deceased and appellant; in fact the record discloses there seems to have been some feeling between the hack drivers on one side and the policemen on the other. The killing occurred just on the edge of what is known as the Al Hayne Triangle, immediately west of the Texas & Pacific Railway depot. Along the street west of

said depot, two street railway tracks are laid. The city council of Fort Worth passed an ordinance prohibiting hack drivers, hotel runners, and kindred classes of people from taking their stand east of this street car track for the purpose of soliciting passengers who came in on the different railway trains. The theory of the State is that appellant took the stand within the prohibited circle and solicited passengers for his hack, and that deceased undertook to arrest him for this reason. This brought up the difficulty, in which the policeman lost his life. The theory of the defense is that appellant did not take his stand within the prohibited circle, and that deceased did not undertake to arrest him, but undertook to wreak his vengeance on appellant for real or imaginary insults offered him during the conversation immediately preceding the homicide. The testimony is very voluminous—unnecessarily so, and a great deal of it is but repetition. The witness Matkins, for the State, locates himself near the scene of the homicide, at about 6:45 o'clock a. m. He says appellant came driving around Main street toward the hack stand and turned in towards where himself and deceased were standing, and drove up within probably eight or ten feet of the sidewalk. Deceased remarked to appellant, "Jeff you are going to keep on running over there until you get another case filed against you." Appellant began backing up to the line, and remarked to deceased, "File it; God damn you, file it." By this time appellant had gotten his carriage backed out to the proper place, and deceased had walked probably fifteen or twenty steps down the sidewalk away from appellant; and appellant remarked, "You are nothing but a God-damned old jobber." Deceased checked up a little, turned rather facing appellant, when appellant again remarked, "That is all you are; you are a God-damned old jobber; and if you want anything out of me you can get it." Deceased replied, "I will just place you under bond; I will place you under bond," and started over to appellant's hack. As he did so, appellant, who was sitting on his hack, arose to a standing position on the boot of his hack, drew a glove off his right hand, and stood in that position until deceased walked up to the side of his carriage to the left. Deceased said to appellant, "Jeff, sign this bond." As deceased approached appellant he took out a bond; that is, he took some papers from his pocket, three or four, maybe more, selected one, and placed the others back; and said, "Sign this bond." Appellant looked down at him, and said "I will sign nothing, God damn you; I will sign nothing." Deceased replied, "If you don't sign the bond you will have to go with me," and reached up and caught appellant on the pants leg, just above the knee, and said, "Get off and come with me; you will have to come with me." At this remark, appellant reached down to the cushion of his carriage, picked up a pistol, and said, "Here is the way I will come down," and fired at Grimes, who was standing right by the side of the wheel. Deceased dodged a little bit, and went back by the side of the hack, and as he did so, appellant fired again; and as he reached the rear end of the hack,

he and the deceased fired about the same time. The firing continued until deceased fell. According to this witness appellant drove across the street railway track toward the depot, and after crossing this he was on the prohibited territory, some twelve feet or more. Appellant drove over to meet passengers. At the time of the shooting the head of appellant's horses were on the street car line, west of the track, as was this witness —his team being a little ahead of appellant's hack. This street railway track designated by the city ordinances is what these witnesses called the "dead-line"—east of which the hacks were prohibited going; and parties were interdicted coming nearer the depot than that unless the passengers spoke to them; and if that occurred, the hackman had the right to go and get such passengers. Witness did not know whether appellant received a signal from any of the passengers or not; but was under the impression they paid no attention to him. There were quite a number of hacks along this "dead-line." This fairly presents the State's side of the case and the attending circumstances.

Battis testified for defendant, that at the time of the difficulty defendant's horses were west of the street car track, standing facing east towards the depot, and appellant was on his hack. The first this witness noticed of the difficulty was when a train came in and some passengers came out from the depot. Appellant called to the passengers, and his team walked on the track; did not walk diagonally across the street but a little south from a straight line, and appellant brought up his team and went to backing them. As he did, deceased hallooed at him, "Better get back across that line." Appellant said, "I am," and laughed. Deceased made a remark to the effect if he did not stay across there he would arrest him. Appellant told him he had not been across the line; and there were some other words spoken, but the witness did not understand what was said. There was some noise and trains running and a street car passed also about that time. The next this witness noticed of deceased he was across the track right by the horses of appellant, close to the wheel of the hack; but he could not understand what either of them said. Deceased walked up by the side of appellant's hack and grabbed him by the coat, near the hip. Appellant sorter twisted a little bit, and deceased hands slipped off appellant's coat, and there was a shot fired. This witness could not see deceased after his hands slipped off appellant's coat, on account of the carriage of hackman Brooks; but there was a shot fired from that side of the hack, and appellant got his pistol and fired immediately afterwards—getting his pistol from under what this witness terms the "dickey-seat" on the hack. "He [appellant] got that pistol immediately after the two shots I heard fired. There was not a great deal of difference between the two shots I heard fired; it was all done very quick. When the first shot was fired, appellant had nothing in his hands but his lines; but when that shot was fired appellant got his gun from under the dickey-seat. Grimes went towards the rear of the hack, and the firing continued until deceased was shot down."

This witness did not hear appellant say, "You are nothing but a God-damned old jobber."

Witness Brooks testified testified that he was a hack driver and his hack was about twenty-five feet from appellant at the time of the difficulty, and there was no hack between his and appellant's; that appellant was at the stand when witness drove up; he heard something said between deceased and appellant. When the passengers came out of the depot he (the witness) remarked, "Drive over and get you, Colonel, if you want a hack;" tapped his horses and stepped over the car track. As he did this, appellant also started over just after this witness, "and cut his horses south in front of Jake Stine's team, standing perfectly still about six or eight feet west of this street car line, and his horses were headed south, and he was after the same people that I was. He did not get them. Officer Grimes (deceased) was standing over on the sidewalk, and told Jeff if he did not look out he would arrest him. Jeff says, "You are nothing but a jobber and a knocker," and Grimes told him if he didn't look out he would arrest him. Jeff told him, "You are a knocker and a jobber." With that Grimes came on over to Vann's hack on the northside of his hack, and stopped about the single tree of the near horse, talking to him. He told him he would have to arrest him—he didn't know what for; and he says, "for driving over there." Jeff told him "I was not over the dead-line." And with that Officer Grimes wanted him to sign a bond, reached his hand down here in his pocket, and Jeff told him he would not do it. With that he moved towards Jeff's hack, and Jeff told him, "Don't climb up here; don't climb up here." At that Officer Grimes stooped over and threw his left foot on the hub, and before he put his foot up he pulled his gun out, had it up in this position, and Jeff stooped over the south side of his hack and Officer Grimes took his foot down and stepped down, I suppose about six feet from the hack, and shot first. When he shot, Jeff then lifted up the dickey seat from the south side and pulled his gun out and shot at Officer Grimes. According to this witness deceased shot again. At this time he placed appellant as standing up and Grimes going toward the rear end of the carriage, and about the time he reached the hind wheel both parties shot; and the officer on reaching the rear end of the hack shot through the glass in the back of the hack, and passed on to the other side of the hack, where the firing was renewed. He says when Grimes fired the first shot he (Grimes) was standing out from the carriage; appellant had nothing in his hand but was standing up in the boot of his hack, and did not reach for his pistol until after the officer had fired the first shot.

Appellant took the stand in his own behalf. He says about 6:30 o'clock a. m. he drove to the Texas & Pacific station. That upon reaching the street car track his horses' front feet stopped about the middle of the west street car track. Deceased was standing across on the sidewalkwalk, and remarked "Get back there or I will make a case against

you." Appellant replied, "Wait until I cross the line before you make any case; you have got no right to make any case until I cross the line." "Deceased started and walked off, I should think a little north; and I says, 'You are nothing but a jobber; and you make a case if you want to.' Deceased turned around and started south, and remarked, 'I will make you take that back,' stepped off the sidewalk," and came close up to appellant by the front wheel of his hack, and told appellant to get off his carriage. He declined to do it. Deceased reached up with his hand and caught appellant by the pants; he pulled loose from deceased, and deceased pulled his pistol and fired. As he fired, appellant got his pistol; and the deceased's second shot and appellant's first shot were close together; appellant's first shot going through the seat of the hack. He did not get his pistol entirely up before it went off. When deceased fired the second shot he was backing towards the north hind wheel of appellant's carriage, and was near the north hind wheel. Deceased passed on around the carriage to the southwest corner, and appellant shot over the corner of the carriage at him. Deceased shot through the back of the carriage at appellant, and appellant jumped off the hack, and as deceased came around the corner of the carriage they met, and appellant fired again, deceased firing about the same time; deceased fell.

There were other witnesses who testified pro and con as these already mentioned. The charter of the city of Fort Worth authorized the city council to pass ordinances of the character mentioned, and also authorized its policemen to arrest without warrant, whenever a violation of any city ordinance was committed in their view. My brethren are of the opinion this clause of the charter and ordinances passed thereunder are valid. The writer does not agree with these views, and believes the ordinance can not confer such power beyond the general State law.

There was a motion for continuance made by appellant, which was overruled, and quite a deal of newly discovered testimony attached to the motion for new trial. But as the case will be reversed upon other propositions and these matters may not occur upon another trial as here presented, a discussion of them is pretermitted.

As we understand the testimony, the issues of murder, manslaughter and self-defense are suggested. The question of killing under the theory of illegal arrest is also presented. If appellant had crossed what the witnesses term the "dead-line" and had taken his stand with his hack in the prohibited territory, this act was in violation of the city ordinance. It may be seriously questioned, however, that he had done so, even from the State's standpoint. The witness Matkins, whose testimony is referred to above, says that appellant had crossed the dead-line, and immediately began backing his hack until he got at the proper position. If this was all that appellant did, he was not in violation of the city ordinance; because he neither stopped nor took his stand within the pro-

hibited territory. While he rushed across the dead-line in his eagerness for passengers, he immediately backed out; and this seems to have been recognized by the officer himself, when he remarked to him, in substance, if he kept running across the dead-line he would have another case against him, and by the reply of appellant, "Wait until I cross the dead-line." The provocation offered by appellant, if in fact it be a provocation, arose out of the remarks made by appellant to. deceased, that he was "nothing but a jobber and a knocker," or a "God-damned old jobber and knocker;" and that deceased "could make a case if he wanted to," continuing with his challenge to deceased to file a case against him if he desired. If appellant had not violated the ordinance, as he contends and his witnesses testified, then the officer had no authority to arrest, and was in the wrong when he threatened him with a case of prosecution. It was the duty of the officer, under the ordinance, if appellant had violated it, to arrest him; and his threat to do it seems to indicate that appellant had not violated the ordinance. If in fact appellant was not violating the ordinance, the officer was the first to use remarks that tended to bring on the difficulty, for if appellant had not crossed the dead-line and taken his stand in violation of the ordinance, the officer's remarks to appellant were uncalled for and unnecessary. There were two facts omitted in the above statement of the .evidence, which are here stated. Each side produced testimony showing that the other had made threats of a serious character. While of a general nature, the threat by deceased included the hackmen, of which appellant was a member, and appellant's threats were against the policemen, and one witness that he made a threat directly against deceased.

Appellant contends, and we think correctly, that he had the right to have a charge on manslaughter unfettered by a charge on provocation with the apparent intention to kill; and also that, under the law and the facts, he was entitled to a clear and unequivocal charge on self-defense unlimited by the law in regard to provoking a difficulty. After defining manslaughter, the 'court places this qualification upon it: "Though a homicide may take place under circumstances showing no deliberation, yet if the person guilty thereof provoke the contest with the actual and apparent intention of killing, or doing some serious bodily injury to deceased,.the offense does not come within the definition of manslaughter." While this is the statutory law, and perhaps in this case was properly given, still appellant was entitled to a charge on manslaughter unfettered by this statute. While perhaps the court should have given this charge for the benefit of the State, at the same time he should have given a charge on manslaughter without this qualification. Certainly the appellant should have a clear, unqualified charge on each controverted issue of fact.

And again, the charge on manslaughter is criticized, and a special charge requested, submitting appellant's theory of this difficulty. That is, if the officer had the right to arrest, and the killing grew out of this

arrest, the act of the officer in arresting must not have been in a threatening and menacing manner. This charge should have been given, and it was error to refuse it. If appellant was violating the law, and deceased undertook to arrest him, and did it in the manner indicated in the testimony, by trying to jerk him from his hack, and failing to do this, drew his pistol on him, the officer himself was in violation of law, and appellant had the right to resist it, and if it became necessary to kill to save his own life from the onslaught of deceased when he drew his pistol and fired at him, he would have been justifiable. If he shot deceased out of anger, because he undertook to pull him off his hack, under the circumstances detailed, and this rendered his mind incapable of cool reflection, he would not be guilty of any higher offense than manslaughter. This phase of the law of manslaughter was not presented by the charge, and the special requested instruction refused.

The court gave several charges in reference to self-defense, which from a casual inspection are clearly erroneous. For instance, he charges the jury, "If you do not believe from the evidence that A. J. Grimes was in good faith attempting to arrest defendant immediately before the difficulty in question, for an alleged violation of the city hack ordinance introduced in evidence; or if you believe that he was attempting to make such arrest, but further believe and find under foregoing instructions that he had no lawful authority to make such arrest; and further believe from the evidence that at the time defendant began to shoot at Grimes, if he did shoot at him, it reasonably appeared to defendant from act or acts then done by Grimes or from some words coupled with his act or acts, that it was the purpose and intent of Grimes to shoot defendant with a pistol, and that defendant then began firing at Grimes for the purpose of preventing being shot by him, and if you do not believe from the evidence beyond a reasonable doubt that defendant willfully and intentionally provoked said difficulty, if he did provoke it, for the purpose of using unlawful violence upon Grimes, then you will find that the killing of Grimes by defendant, if he did kill him, was not an unlawful killing, but was done in his lawful self-defense, and therefore justifiable, even though you should further believe that said apparent danger to defendant, if any, was not real." Exception was reserved to this charge. It will be noted in the first statement of this charge that it required the jury to find as an affirmative fact that Grimes was not in good faith attempting to arrest appellant; in other words, it shifts the burden of proof. Appellant is entitled to the reasonable doubt on every proposition where his life or liberty is sought to be taken. This, as every other charge given on self-defense, is limited and restricted by a charge on provoking the difficulty. While exception was not reserved to the paragraph of the court's charge following the one above quoted, still a special charge was asked and refused covering the error in that charge; and to the failure of the court to give the special instructions, excep-

tion was reserved. This refusal was error, and the charge of the court sought to be corrected by this special charge was flagrantly erroneous.

Again, the court instructed the jury: "If you do not believe from the evidence that defendant provoked the difficulty in question with the apparent intention of killing A. J. Grimes, or doing him serious bodily injury, and if under foregoing instructions you find that said Grimes had no lawful authority to arrest defendant, and that defendant knew of such want of authority to make such arrest, and if you further believe from the evidence that immediately prior to the time defendant began firing at A. J. Grimes, he, Grimes, was attempting to arrest defendant, and that said attempt aroused in defendant sudden passion, as sudden passion is above defined," etc. As before stated, the jury are required .here to find affirmatively from the evidence that appellant did not provoke the difficulty with the apparent intention of killing Grimes or doing him serious bodily injury; and they are further required to find affirmatively that Grimes had no lawful authority to arrest defendant, and that defendant knew of such want of authority to make such arrest before they could acquit or reduce his crime below that of murder. It would take no reasoning to show this to be error. If there was a reasonable doubt upon either proposition, defendant was entitled to the benefit of it. That is, the jury should be required to find beyond a reasonable doubt that defendant provoked the difficulty; and if there was a reasonablee doubt as to whether Grimes had the authority to arrest or not, appellant has the benefit of such doubt. But this charge solves both doubts, adversely to defendant and required the jury to find affirmatively that neither existed before they could give him the benefit of the law.

In every charge on self-defense appellant's right of self-defense was limited by a charge on provoking the difficulty. The charge is further criticized because it nowhere informs the jury what is necessary to constitute provoking the difficulty. The language is as above quoted: "If the jury do not believe that defendant provoked the difficulty." Under all the authorities, and under the law, in order to constitute provoking a difficulty, there must be something said or done by the accused with intent to produce the occasion or bring about the difficulty which makes him responsible criminally. The jury are nowhere told in regard to the law of provoking the difficulty, that defendant must have said or done something which produced the occasion or brought about and provoked the difficulty. These matters are criticised in the court below and special charges asked and refused. All the special charges, except number 3, were directly applicable to the facts of the case and should have been given. The last case decided by this court with reference to the court limiting throughout the charge on self-defense by a charge on provoking the difficulty, is Drake v. State, at the present term. However, that case but follows the unbroken line of authority.

Independent of appellant's right to have a charge on self-defense

growing out of his theory of illegal arrest, as well as a proper charge on manslaughter in that connection, defendant's evidence presents clearly and emphatically a case of self-defense from an attack made by the officer independent of the question of arrest. If deceased approached defendant's hack and undertook to pull him from it, and failing to do this, began firing upon him with his six shooter, appellant had the unquestioned right to defend; and the further right to continue shooting until all danger to himself had passed. This issue was presented by the testimony.

Again, the court fettered appellant's right of self-defense by a charge on the relative strength and size of the parties. It would make no difference how large one may be or how small the other; if the smaller one is shooting with a six-shooter, the other has a right to protect himself without any question as to the relative strength of the parties or their size. A six-shooter is as dangerous in the hands of a small man as in the hands of a robust person. Hickey v. State, 8 Texas Ct. Rep., 579.

At the termination of the difficulty Fulford and Witcher seized appellant; and it is left in doubt when appellant's last shot was fired, whether while they had hold of him, or immediately before they seized him. Fulford testified that he remarked, "Jeff, you have played the devil now." Appellant replied, "Damned big son of a bitch ought to be killed; there is no son of a bitch can pull me off my hack." Objection was urged to this, that appellant was under arrest, having been seized by the officers. Under the unbroken line of authority in this State, this testimony was admissible as res gestae. Witcher denied hearing this.

Judkins, after predicate laid to impeach witness Battis, was permitted to testify, as follows: "That he (Judkins) said to witness Battis, 'It is a shame to murder a man like that.' Battis replied, 'He ought to have been killed, and I would kill any man, God damn him, that would try to pull me off my hack.'" Judkins was permitted, after Battis denied these statements, to swear before the jury to this conversation. We think the exception was well taken. This was an opinion of Judkins, gotten before the jury as to his view of the homicide; and the answer to this, if Battis did make it, was not legitimate impeachment.

Objection was urged to the action of the court permitting the witnesses Nellie Garey and Lizzie Murray testifying, because it seems that they had been from under the rule in the courtroom part of the time, and had discussed their testimony and the facts of the case, after being placed under the rule. This will not occur upon another trial, and is therefore not discussed.

As before stated, the questions arising on the action of the court refusing the continuance and overruling the motion for new trial are not discussed. The witnesses mentioned in both instruments may be pres-

ent on another trial; and if they are not, the questions will come in an entirely different shape and under different environments.

. For the errors discussed, the judgment is reversed and the cause remanded.   '

*Reversed and remanded.*

BROOKS, JUDGE (Dissenting.)—I dissent from the opinion of the majority and do not believe there is any reversible error in this case. I may write my views later.