

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,924

RANDALL WAYNE MAYS, Appellant

v.

THE STATE OF TEXAS

## ON DIRECT APPEAL FROM THE 392nd JUDICIAL DISTRICT COURT
## HENDERSON COUNTY

**COCHRAN, J., delivered the opinion of the unanimous Court.**

## OPINION

In May 2008, a jury convicted Randall Wayne Mays of capital murder for the shooting

death of Henderson County Deputy Sheriff Tony Ogburn.[1] Based on the jury's answers to

the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b)

and 2(e), the trial judge sentenced Mays to death.[2] After reviewing Mays's twenty-one points

---

[1] TEX. PENAL CODE § 19.03(a)(1).

[2] TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

of error on direct appeal, we conclude that they are without merit.  Accordingly, we affirm the trial court's judgment.

## Factual and Procedural Background

Appellant was charged with the capital murder of two sheriff's deputies and the attempted capital murder of a third deputy, all stemming from a stand-off with police at his rural property.  This appeal is from appellant's trial for the first deputy's death.

The evidence showed that at about 3:00 p.m. on May 17, 2007, Fran Nicholson called the Henderson County 911 dispatcher and said that appellant, her neighbor, was shooting a handgun at his wife, who was close to the road.  Mrs. Nicholson was worried because the school bus was about to drop off her granddaughter near where appellant was shooting.  After the first shot, Mrs. Nicholson heard one or two more, and she saw appellant's wife, Candis, walking down the easement.  Candis and appellant were screaming at each other.

Deputies Billy Jack Valentine, Duane Sanders, and Eric Ward responded to the "domestic violence–gunshot" dispatch call.[3]  All three were in uniform, wearing badges, and driving marked patrol cars or trucks.  Appellant's two-acre property was surrounded by pipe fencing,[4] so Deputies Valentine and Sanders hopped over the fence to talk to the couple who

---

[3] Deputy Valentine testified that he had just returned to the sheriff's office after attending a peace officers' memorial service for fallen officers when he received the dispatch.

[4] Appellant was a welder.  His property contained a residence, several sheds, considerable welding equipment, and some farm machinery, as well as a variety of farm animals.

were still standing near the road.[5] Candis, who was described as being "slow," walked "right up directly in [Deputy Sanders's] face." She was angry and said he had no business being on their property. "We're just having a spat." Appellant, however, was calm, polite, and friendly. He explained that Candis had been sexually assaulted and he was mad about it.

Appellant told Deputy Valentine that he did not know who had called the police, but he "guessed" that Candis had. Valentine assured appellant that he was just trying to do his job and figure out what was going on, so he called dispatch to find out who had made the 911 call. When the dispatcher said that the call came from the neighbor, Fran Nicholson, Valentine sent Deputy Sanders over to the Nicholsons' house to find out why she had called. Just as he was leaving, Sanders saw Deputy Tony Ogburn arrive in his patrol car. Deputy Ogburn was wearing his police uniform and hat.

In the meantime, Valentine asked appellant if he had a gun on him and whether he had been shooting. Appellant said that he had been "target practicing," and that the gun was in his house. Valentine also calmed Candis down, and appellant joked about how he "was wanting to get some loving from her and that's what started this." Throughout, appellant "was very nice, courteous"; he was "super-calm." However, Valentine also stated that appellant was well known to the local deputies because "[h]e shoots a lot out there."

Sanders radioed back that the Nicholsons wanted to press charges against appellant

---

[5] Valentine had turned on his patrol-car videotape and body microphone as he pulled up to appellant's property. Virtually everything that was said by the officers, appellant, and Candis during the stand-off was on the audio tape, but the fixed-position video recorder did not capture much of the action. The tape is almost five hours long, although the stand-off itself lasted less than an hour.

for deadly conduct, so Valentine called dispatch to see if appellant had any felony convictions or arrests. He did; "the most recent [arrest] was a 7/1/99 assault on a public servant." Valentine said, "That was me, that was on me."[6] He then approached appellant to arrest him and said, "Before you talk to me any more, OK, listen to me. Now don't make this no harder than it's gonna be, OK? You have the right to remain silent– " At that moment, appellant's face changed, and he started backing up.

According to Fran Nicholson, who was watching from her front porch, appellant "broke to run for the house." Valentine reached out to grab the back of appellant's T-shirt to stop him from getting to the house where appellant had said he had weapons. Appellant's T-shirt ripped, and he pulled a knife and ran in the front door with Valentine close behind. Appellant emerged a few seconds later "with the barrel of the rifle coming out." It was a 30.06 deer rifle with a scope. Valentine was about two and a half feet away, but appellant did not shoot; instead, he yelled, "Back off, back off!" Appellant disappeared back inside the house as Valentine screamed, "He's got a gun!" to warn the other officers. Valentine ran back around the side of the house, took cover behind a truck, and kept talking to appellant to calm him down, get him to put down the rifle, and come back outside. Valentine testified that appellant pulled a chair up to a window, sat down, and kept talking to him. "We just

---

[6] Later testimony showed that appellant almost drove into the back of Valentine's pick-up truck as Valentine was backing out of his driveway one day. The deputy was off-duty, in plain clothes, and with his wife, but when he saw appellant continue to swerve down the road, he followed the car until it pulled into a driveway. When Valentine walked up to the driver's door and asked the driver to step out, appellant got out and hit the deputy in the head with his fist. Valentine thought that appellant was intoxicated. Although appellant was arrested, the charge was later dismissed.

kept going back and forth, just different things." Even during the middle of the stand-off, appellant "seemed to be fine mentally."

Deputy Sanders had returned from the Nicholsons, and he took cover along with Deputies Ward and Ogburn. More officers kept arriving and they, too, took up defensive positions behind cars, trucks, and sheds. Appellant and Valentine intermittently yelled and talked back and forth for more than fifteen minutes.[7] Meanwhile, Candis was wandering in the open yard between the deputies and appellant, getting in the line of possible fire, saying that the officers were not going to shoot her husband and he wouldn't shoot them. A deputy finally tackled her and pulled her off behind a shed where he handcuffed her to keep her safe. Other officers, including Deputy Ogburn, took turns talking to appellant.

After about twenty minutes, appellant climbed out of a window without his rifle and started forward toward the officers. As one deputy talked to appellant, keeping him calm, Valentine tried to "slowly ease" between appellant and the open window to ensure that appellant could not run back into the house where the guns were. Appellant saw him, turned,

---

[7] All of this conversation was captured on Valentine's recorder. Valentine repeatedly promised not to hurt appellant, but appellant yelled that he feared they would kill him and said that "Ya'll killed all three of my brothers." [According to later witnesses, appellant did have three brothers who were all dead: one executed by the state; one shot to death; and one who died of a drug overdose.] Appellant yelled, "You've got a gun and I've got one." When Valentine asked appellant to admit that Valentine had been honest with him, appellant responded, "You tried to take me to jail!" Appellant expressed confusion about why he was "the bad guy" when the officers had originally come to help his wife. He was mad that Deputy Valentine tore his T-shirt when grabbing for him. He said, "I'm sick, I'm feeling real sick, I'm about to die, anyway, I was poisoned." Later, he said that he was "a military man." [Later witnesses said that appellant joined the Army when he was young.]

and bolted back toward the window.  Valentine ran to intercept him, but he tripped over a garden hose and fell as appellant dived head-first through the window.  Valentine got up, but he was then trapped against the side of the house as appellant could shoot through either of two windows beside Valentine, and he was in the direct line of fire from his fellow deputies.

Three minutes later, appellant shot.[8]  Deputy Sanders heard the blast and saw Deputy Ogburn's hat fly in the air and saw part of his head explode.  Appellant then yelled, "Where's the other one?  I'll take him out, where is he?"  Inspector Paul Habelt ran toward Sanders, waving his arms.  Appellant shot Habelt in the head, killing him also.  The officers then started shooting back.  Sanders saw Deputy Kevin Harris run past a nearby shed, "[a]nd as he got to the end, I saw him jump, exchange the gunfire, and I saw his leg explode from impact."  But appellant was also wounded during this exchange.  He screamed, "I give up. I've been hit.  I give up.  I've been hit."  He finally walked out of the house and surrendered. Appellant later told news reporters that he had killed the two deputies because "I felt I was being mistreated."

During his case-in-chief, appellant called Ron Shields, the instructor for an Intermediate Crisis Intervention class that Deputies Valentine, Sanders, and Ward had attended just ten days before the stand-off.  He testified that all three deputies had scored an "excellent" after their training.  Shields noted that the course had covered techniques for dealing with mentally ill or distressed people, but he explained, "Whenever weapons [are]

---

[8] All of the witnesses, including the Nicholsons' daughter, testified that this was the first shot fired.

involved, this training pretty well goes out the window." He also said that, once a suspect is separated from his weapon, "you use all means necessary to keep him separated from that weapon" regardless of his mental instability or distress.

Defense counsel called Dr. Gilda Kessner, a psychologist who had never talked with appellant, to testify to her opinion that appellant suffered from a "thought disorder with a paranoid ideation." Paranoia, she explained, is characterized by "suspiciousness, distrust, fearfulness." She stated that paranoia is exaggerated in a crisis and "involves a deep mistrust and suspiciousness and expectation that individuals have a malevolent, deceitful motive when they deal with you." Paranoia does not prevent someone from acting intentionally or knowingly, but such a person is "influenced by the disordered thoughts."

Dr. Kessner agreed that appellant showed no signs of paranoia until Valentine began to read him his *Miranda* rights. She did not find any indications that appellant experienced any auditory or visual hallucinations. She said that appellant was not insane and that he could "intentionally or knowingly do anything, shoot in this case. I mean, that's apparent."

The defense also offered the written transcript of testimony by Dr. Theresa Vail that had been taken outside the presence of the jury. Dr. Vail was appellant's treating psychiatrist in jail. But because she had never discussed the crime with appellant, she had formed no conclusions about whether he might have been experiencing delusions at the time of the murders. She said that appellant was capable of forming the intent to commit his actions and able to understand their consequences. Dr. Vail also noted that, while appellant's belief that

he was being poisoned[9] was false, the stomach-aches that he described as being the basis for this belief are common in anxious people such as appellant.

After deliberating for one hour, the jury found appellant guilty of capital murder.

During the punishment phase, the jury heard brief victim-impact testimony from Deputy Ogburn's widow[10] and son. Deputy Harris testified that his injured leg continued to affect him and that Deputy Ogburn's wisdom had helped him during his own father's terminal illness. Deputy Valentine testified that Deputy Ogburn had been a mentor to him during his law-enforcement career and that the events during the stand-off had adversely affected him.

During the defense case-in-chief at punishment, Dr. Vail testified in person. She diagnosed appellant with depression and "a psychotic disorder not otherwise specified," a condition that would make a person more dangerous.[11] She did not know if appellant was mentally ill on the day of the stand-off, and she did not have any indication that he had previously been treated for a mental illness. Dr. Vail did not begin treating him until four months after the stand-off, and she never asked him anything about that day.

---

[9] *See supra* note 7.

[10] Mrs. Ogburn, who testified from her wheelchair, said that she suffered a stroke in 1996, and ever since then her husband had taken care of all of her needs. After his death, she had to move and now lives with her sister in The Colony, TX.

[11] She stated that a person with the type of psychosis that appellant had might suddenly "go off" when he felt threatened. Dr. Vail said that appellant had already had problems with a fellow inmate, and he thought that the jailers were poisoning his food.

Several family members testified that appellant was good with children and took care of his family.[12]  Appellant's sister, Sherry Ross, testified that appellant's older brother had been executed for murder sometime around 1999.  Appellant saw a second brother shot and killed in 1977.  A third brother died of a drug overdose.  Ms. Ross testified that appellant had been committed twice for drug use, but that he had stopped using drugs around 1991 when he bought his rural property.  Another sister, Linda Ross, testified that appellant sometimes had mental "spells" when his eyes would get wide and he would act suspicious and distrustful of her.  Appellant's mother also testified that, a couple of times, she had seen appellant get a "weird look" in his eyes, but he was "a good man . . . a loving father.  He loved children.  He always played with the nieces and nephews.  He'd give anybody the shirt off his back, if somebody walked up to him and asked him."  Various friends testified that appellant was gentle, honest, even-tempered, and never out of control.

Dr. David Self, a psychiatrist, testified that he had reviewed various records, but, because he had never examined appellant, he could not make a formal diagnosis. Nonetheless, he opined that appellant had a "chronic and severe psychiatric illness" that was "centrally involved in the causality of this offense."[13]  He thought that the evidence of the

---

[12] Candis's daughter, Christina White, testified that she was relieved when appellant married her mother, who was mentally unable to take care of herself.  Ms. White noticed that a couple of times appellant suddenly changed moods without any warning.

[13] Based on listening to the tape recording of the stand-off, Dr. Self opined that appellant's statements and actions throughout were consistent with someone who was coming in and out of a delusional state.

crime showed that appellant was experiencing delusional thinking. Nonetheless, appellant understood that his actions during the stand-off were wrong and illegal. Dr. Self also thought that appellant's heavy methamphetamine use fifteen years earlier might have contributed to his psychosis because this drug destroys brain nerves and tissue.

After deliberating less than three hours, the jury answered "yes" to the future dangerousness issue and "no" to the mitigation question. The trial judge then sentenced appellant to death.

### Interviewing Jurors About Pretrial Publicity

In his first point of error, appellant asserts that the trial judge denied him a fair trial when he refused to poll the jury, immediately before the start of trial, on whether they had been exposed to or affected by media coverage of the case. Appellant argues that the public feeling against appellant "saturated" the local population, thus the decision to proceed with the trial without polling the jurors about this issue was an abuse of discretion and offended the Eighth and Fourteenth Amendments.

Right before trial, appellant asked the judge to poll the empaneled jurors to determine whether any of them had read an editorial that had appeared in the *Athens Daily Review* the day before.[14] Counsel stated that the editorial suggested that law enforcement was watching

---

[14] In his Brief, appellant cites to some fourteen articles, a couple of electronic signs, and an obituary as examples of the "saturating" media coverage. The State asserts that these items are not proper for consideration because they were never presented to the trial court and because of a lack of "citations, or even dates of supposed publication." We have no doubt that the pretrial media coverage was substantial, but the only question before the trial judge was whether it should poll the jury on its exposure to the single editorial that appellant presented to the judge.

what happened in this trial.[15]  The trial court responded,

> the Court is not aware, or it's not been brought to the Court's attention any evidence that the jury has violated its instructions.
> And the Court gave its instructions and will continue to emphasize those instructions throughout the trial.  And without any evidence brought to the Court, the Court will deny the motion to voir dire the jury of its–regarding any publicity.

Appellant now argues that the failure to let him make an offer of proof on whether the jury was affected by the media was a constitutional violation.[16]  This point of error is controlled by *Powell v. State*,[17] a case in which we rejected a nearly identical claim.

In *Powell*, the defendant argued that the trial court erred in refusing to poll the jurors–prior to trial but after they had been empaneled and sworn–about a newspaper article covering a hearing on the admissibility of DNA evidence.[18]  Although the trial court refused to poll the jury about the article, it admonished the jury numerous times not to read any

---

[15] At trial, appellant argued that the editorial appeared "to communicate to the jurors that the law enforcement and policemen of Henderson County are watching this jury to see what the outcome is.  And the implication being that–the implication could be drawn that since they're all residents of Henderson County that they will be–that they may be required in the future to seek protection and service from law enforcement."  The State disagreed with this characterization of the editorial, saying, "I think it just indicates there were two individuals that were known to the editor."

[16] *Cf. Henley v. State*, 576 S.W.2d 66, 73 (Tex. Crim. App. 1978) ("[T]he trial court's refusal to grant appellant a pretrial hearing to introduce evidence in support of his motion for change of venue precluded a determination, as contemplated by our law, of the community attitude toward appellant and constituted a deprivation of due process.").

[17] 898 S.W.2d 821 (Tex. Crim. App. 1994).

[18] *Id.* at 828.

newspaper articles concerning the case.[19]  In that case, we noted that the trial judge could either deny the defendant's request for a jury poll concerning the article, or he could poll the jury and risk exposing them to the existence and contents of the article for the first time.  By refusing to poll the jury about the article and reiterating its admonishments, the trial judge did his best to preserve the integrity of the jury panel.[20]

The same is true in this case.  The trial court repeatedly instructed the jury panel, the individual jurors selected, and the empaneled jury not to read, watch, or listen to any media

---

[19] *Id.*

[20] *Id.  See* W.R. Frothingham*, Interrogation or Poll of Jurors, During Criminal Trial, as to Whether They Have Read Newspaper Articles Pertaining to Alleged Crime or the Trial,* 15 A.L.R.2d 1152, *1 ("The few cases that involve this specific point all uphold the trial court where it refuses to interrogate, or refuses to let a party interrogate, the jurors as to the reading of newspaper articles relating to the trial or the crime.  The decisions generally turn on the fact that the trial court had instructed the jury not to read the articles or that there had been no showing by the moving party that the jurors had in fact read them."); *United States v. Jackson*, 649 F.2d 967, 976 (3rd Cir. 1981) ("To require the trial court to conduct an individual voir dire of all of the jurors, who have been repeatedly and properly instructed regarding news media reports, whenever there are prejudicial news media reports, rather than to limit the voir dire to jurors, if any, who have seen or heard such reports, is not consistent with the 'large discretion' needed by the court to move the trial along both expeditiously and fairly."); *Young v. State*, 623 S.E.2d 491, 495-96 (Ga. 2005); *Weaver v. State*, 763 So. 2d 972, 977 (Ala. Crim. App. 1998), *overruled on other grounds by Ex parte Rice*, 766 So. 2d 143 (Ala. 1999) ("'In the absence of any allegation that any juror actually read [newspaper articles about the case], we find no error in the judge's failure to poll the jury to determine whether or not any juror may have read [newspaper articles.]'"); *Carlyle v. State*, 428 N.E.2d 10, 13-14 (Ind. 1981) (same); *State v. Marshall*, 353 A.2d 756, 759 (Conn. 1974) (same).  *But see State v. Bey*, 548 A.2d 846, 870 (N.J. 1988) (holding "that where a timely, properly supported midtrial motion to poll the jury concerning prejudicial publicity is refused, and there is a realistic possibility that information with the capacity to prejudice the defendant may have reached one or more members of the jury, the defendant must be given a new trial.").  In *Bey*, the problem was that the jury may have read about an extraneous murder that the defendant had committed.  The court stated, "the midtrial publicity . . . disclosed that defendant was going to be tried for a second murder after the completion of the first trial.  Jurors exposed to this publicity could have discovered that the second murder was committed close in time and in a similar manner to the Alston murder.  It is hard to imagine publicity with a greater capacity to prejudice a defendant's case." *Id.* at 869-70.

stories about the case.

* Once the venire panel was qualified, the judge gave three separate instructions not to read any newspaper articles, watch any television reports, or listen to any radio reports concerning the case. He excused for cause every panel member who was identified as not being able to set aside an opinion formed about the case from media reports.

* During the individual voir dire, the judge asked each juror if he could comply with written instructions not to read any newspaper articles, watch any television reports, or listen to any radio reports concerning the case. Each juror said that he could.

* At the beginning of trial, the judge instructed the jury not to read any newspaper articles, watch any television reports, or listen to any radio reports about the case.

* At the end of each day of trial, before releasing the jury, the trial judge instructed the jury not to read any newspaper articles, watch any television reports, or listen to any radio reports concerning the case. The jury received this instruction on May 5, May 6, May 7, May 8, May 9, May 10, and May 12.

Following *Powell*, we hold that the trial judge did not abuse his discretion by declining to poll the jury rather than risk exposing the jury to the existence of the *Athens Daily Review* editorial for the first time. In following the guiding rules and principles of *Powell*, the trial court preserved the integrity of the jury. Point of error one is overruled.

## Issues Related to Mental Health

Appellant raises a number of issues related to his mental health on the day of the murders.

## A.    The Constitutionality of Executing the Severely Mentally Ill

In his third point of error, appellant asserts that the execution of a severely mentally ill person offends the Eighth Amendment ban on cruel and unusual punishment and violates the Equal Protection Clause of the Fourteenth Amendment. Appellant asserts that the

testimony of his mental-health experts was uncontroverted and that they established that appellant is severely mentally ill and his illness "adversely affected" his behavior on the day of the murders.  He argues that the rules announced by the Supreme Court in *Atkins v. Virginia*,[21] banning the execution of the mentally retarded, and in *Roper v. Simmons*,[22] banning the execution of juvenile offenders, should be extended to the mentally ill.  He relies upon various pronouncements in the international community, and he cites law-review articles that argue that there is no rational basis for distinguishing the severely mentally ill from the mentally retarded.

However, appellant does not cite any case from any American jurisdiction that has held that the *Atkins* rule or rationale applies to the mentally ill.[23]  We have previously held, albeit in unpublished opinions, that "there is no authority from the Supreme Court or this Court suggesting that mental illness that is a 'contributing factor' in the defendant's actions

---

[21] 536 U.S. 304 (2002).

[22] 543 U.S. 551 (2005).

[23] Several state courts have expressly declined to extend the *Atkins* ruling to the mentally ill in published opinions.  *See, e.g., Johnston v. State,* 27 So.3d 11, 26-27 (Fla. 2010); *State v. Ketterer*, 855 N.E.2d 48 (Ohio 2006); *Matheney v. State*, 833 N.E.2d 454 (Ind. 2005); *Hall v. Brannan*, 670 S.E.2d 87 (Ga. 2008).  Others have done so in unpublished opinions.  *Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696 (Tenn. Crim. App. Jan. 13, 2010) (not designated for publication); *Johnson v. Comm*., No. 2006-SC-000548-MR, 2008 WL 4270731 (Ky. Sept. 18, 2008) (not designated for publication).  Federal courts have also rejected appellant's argument for various reasons.  *See, e.g., ShisInday v. Quarterman*, 511 F.3d 514 (5th Cir. 2007) (claim procedurally barred "for failure to present the issue to the state court.  In addition, this circuit's precedent precludes that argument, unless the petitioner contends he is insane and therefore incompetent to be executed."); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (citing *In re Woods,* 155 Fed. Appx. 132, 136 (5th Cir. 2005) and stating that applicant's claim of mental illness as a bar to execution did not rely upon a new rule of constitutional law made retroactive by the Supreme Court ).

or that caused some impairment or some diminished capacity, is enough to render one exempt from execution under the Eighth Amendment."[24]    Furthermore, appellant has not demonstrated that there is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders.[25]   Finally, appellant has failed to show that, if he did suffer from some mental impairment at the time of these murders, that impairment was so severe that he is necessarily and categorically less morally culpable than those who are not mentally ill.  We, therefore, overrule point of error number three.

## B.    "Diminished Capacity" Instruction

In his fifth point of error, appellant asserts that the trial judge violated his statutory[26] and constitutional due-process rights by giving the jury the following instruction:

You are further instructed that you may consider any mental condition, if any,

[24] *Tabler v. State,* No. AP-75,677, 2009 WL 4931882, *1 -2 (Tex. Crim. App. Dec. 16, 2009) (not designated for publication); *see also Sprouse v. State*, No. AP-74,933, 2007 WL 283152, *8 (Tex. Crim. App. Jan. 31, 2007) (not designated for publication); *Battaglia v. State,* No. AP-74,348, 2005 WL 1208949 at *10 & n. 39 (Tex. Crim. App. May 18, 2005) (not designated for publication) (citing *Colburn v. State,* 966 S.W.2d 511 (Tex. Crim. App. 1998)).

[25] *See Atkins,* 536 U.S. at 312 ("the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'") (quoting *Penry v. Lynaugh,* 492 U.S. 302, 331 (1989)); *see also Tabler*, 2009 WL 4931882, *2 (noting, in rejecting claim that mentally ill offenders should be exempt from execution, that defendant "does not demonstrate that there is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders.").

[26] Appellant relies on article 36.14 of the Texas Code of Criminal Procedure, which requires the trial court to distinctly set forth the law applicable to the case, and article 38.36(a), which permits the admission of evidence to show the accused's state of mind at the time of the offense as the legal basis for his complaint.

of the defendant, that he did or did not act intentionally or knowingly in committing the alleged offense, but you cannot consider any mental condition, if any, that the defendant lacked the capacity to act intentionally or knowingly.

At trial, appellant filed a written objection to the court's charge for failing to instruct the jury that evidence of mental illness may be considered in determining whether or not he acted intentionally or knowingly. Appellant did not suggest specific language, so presumably the trial judge drafted the above instruction in response to appellant's written request.[27]

Appellant argues on appeal that his "defense was that his active, serious mental illness prevented him from knowingly or intentionally killing at the moment he pulled the trigger."[28] But that was not his defense at trial. No witness testified that appellant–with or without a mental illness–did not knowingly or intentionally shoot Deputy Ogburn with a single shot right between the eyes. Indeed, the evidence showed that immediately after he shot his first victim, appellant shouted, "I got one. Where's the other one?" before he shot another deputy in the head. None of appellant's experts testified that he did not intend these actions. Indeed, appellant's trial counsel forthrightly admitted during his closing argument at the guilt stage that, "yes, a person can have a paranoid delusion, suffer from paranoia and intentionally and knowingly do what they want to do, in this case, shoot two police officers." At trial, defense

---

[27] At the end of his nine-page list of written objections to the jury charge, appellant, in his objection number 25, set out eleven reasons why he opposed any limitation upon "the inference the jury may draw from the evidence of mental disease or defect." Thus, although appellant requested a jury instruction on how mental illness may be considered in determining whether he acted intentionally or knowingly, and the trial judge gave such an instruction, appellant then complained about the wording of the actual instruction given.

[28] Appellant's Brief at 49.

counsel stated that he offered the mental-illness testimony as "just an explanation about what went on out there." Appellant's mental-illness evidence explained his actions and demonstrated his motive for killing the deputies–paranoia, suspicion, and distrust of the officers. It did not rebut the culpable mental state of "intentional or knowing" conduct or raise any legal justification or exoneration for the murders.

Although appellant acknowledges that there is no "diminished capacity" defense in Texas,[29] he nonetheless argues that the trial judge erred by instructing the jury that it was not permitted to consider mental-illness evidence that appellant "lacked the capacity to act intentionally or knowingly."

Appellant cites to this Court's decision in *Ruffin*, but that case is not analogous. In *Ruffin*, the defendant (and others) testified that he suffered from both auditory and visual delusions. He testified that when he shot at the police officers, he thought he was shooting at "Muslims."[30] He literally saw and heard Muslims. Under those circumstances, this Court held that he might be entitled to offer expert psychiatric testimony that some people who suffer from serious mental diseases and delusions really can and do "see" and "hear" Muslims (or other figments of their imagination) even though they do not exist. This evidence was relevant to rebut the element that Ruffin intended to shoot *police officers* and would, if believed, lessen the crime from a first-degree aggravated assault of a police officer

---

[29] *See Ruffin v. State*, 270 S.W.3d 586, 593, 596 (Tex. Crim. App. 2008); *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005).

[30] *Ruffin*, 270 S.W.3d at 594.

to a second-degree aggravated assault (an intentional shooting at "Muslims").[31]

In the present case, appellant offered no evidence to suggest that he intended to shoot anything or anyone other than the police officers that he killed.[32]  Appellant offered no evidence to suggest that he did not intend to shoot a person.[33]  All of his mental-illness evidence showed why he intentionally and knowingly killed the deputies: He was paranoid and thought they had "mistreated" him.  But motive is not an element of murder or capital murder.  Such mental-illness testimony may be relevant for mitigation purposes during the punishment phase, but expert testimony that does not directly rebut the culpable mental state usually may be excluded at the guilt stage.[34]

---

[31] *Id.* at 596-97.

[32] Such evidence, if it had been proffered and admitted, would directly rebut the element that elevated murder under TEX. PENAL CODE § 19.02 to the capital murder of a police officer under TEX. PENAL CODE § 19.03(a)(1).

[33] Such evidence, if it had been proffered and admitted, would directly rebut the culpable mental element of either capital murder or murder. *Id.*

[34] *See Ruffin*, 270 S.W.3d at 595-96 (expert testimony concerning a defendant's mental illness "may, in a particular case, be excluded under other evidentiary rules, such as Rules 403 or 703-705, if the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, if the expert is insufficiently qualified, or the testimony is insufficiently relevant or reliable under our state's guidelines for expert testimony.  Such evidence may also be excluded if it does not truly negate the required *mens rea*."); *Jackson*, 160 S.W.3d at 574; *cf.*, *Ward v. State*, No. AP-75,750, 2010 WL 454980 at *2 (Tex. Crim. App. Feb. 10, 2010) (not designated for publication) (trial court did not err in excluding expert's testimony that capital-murder defendant was psychotic and had paranoid delusions which led him to believe that there was a conspiracy by city officials to harm him and caused him to murder city employee); *see also United States v. Cameron,* 907 F.2d 1051, 1067-68 (11th Cir. 1990) ("Evidence offered as 'psychiatric evidence to negate specific intent' is admissible . . . when such evidence focuses on the defendant's specific state of mind at the time of the charged offense," but holding that defendant failed to demonstrate how her expert's generalized psychiatric testimony would negate intent in drug-trafficking prosecution).

In sum, the trial judge was not required to admit any expert testimony concerning

appellant's mental illness during the guilt stage because it did not directly rebut his culpable

*mens rea*.[35] Thus, appellant was not entitled to any jury instruction concerning that evidence.

But having requested such an instruction, appellant has not shown that he suffered any harm

when the trial judge gave the jury a legally correct, if unnecessary, instruction concerning the

use of that evidence.  Appellant's fifth point of error is overruled.

## C.    "Mistake of Fact" Instruction

In his seventh point of error, appellant asserts that the trial judge erred by refusing to

submit a jury instruction concerning mistake of fact based on appellant's "paranoid ideations

and psychotic delusions."  He argues that this evidence entitled him to an instruction on the

statutory mistake-of-fact defense[36] because he may have believed that the deputies he killed

were not acting in the discharge of their official duties.  He posits that the record suggests

that appellant "mistakenly but honestly believed that the officers were rogue cops, out to

harm or lynch him and his wife, and perhaps take his property."

First, appellant does not cite to any portion of the record that would support such a

belief.[37]  Nor did he cite the trial judge to any such evidence in the record.[38]  His assertion

---

[35] *See Ruffin, Jackson*, and *Ward, supra*.

[36] Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 8.02(a) ("It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense.").

[37] He states that "a reasonable juror might conclude that Mays actually believed that a vast and brutal conspiracy of armed men, abusing their status [as] peace officers had killed his three

is based entirely upon speculation about what appellant might have been thinking or could have thought, but there is no evidence that supports a conclusion that appellant did believe the officers were "rogue cops" who were not acting in lawful discharge of an official duty. The only evidence that directly supports appellant's paranoid state of mind at the time of the murder was his statement to reporters that he felt "mistreated."  But that evidence does not raise any "mistake" of a specific historical fact that, if true, would negate his intent to kill Deputy Ogburn.  The issue in *Posey v. State,*[39] as in the present case, was whether the defendant was entitled to an jury instruction on the defensive issue of "mistake of fact" when he did not "properly preserve" that issue by making a timely and adequate request or objection in the trial court.[40]  The purpose of the *Posey* rule is to prevent a party from "sandbagging" the trial judge by failing to apprise him, and the opposing party, of what

---

brothers.  There was a religious fervor in Mays' words and actions.  Some of Mays' words [during the stand-off] did not seem to fit into the context in which they were uttered.  The mental health experts thought Mays had a thought disorder."  Appellant's Brief at 59.

[38] The entirety of appellant's written objection at trial was as follows: "The Defendant objects to the Court's failure to instruct the jury on the law of mistake of fact."  This objection is not sufficient to direct the trial judge's attention to the evidence upon which appellant would rely for entitlement of such an instruction. *See Goodrich v. State*, 156 S.W.3d 141, 147-48 (Tex. App.—Dallas 2005, pet. ref'd) ("When requesting an instruction on the defense of mistake of fact, the party must specify the fact alleged to have been mistaken."); *Williams v. State,* 930 S.W.2d 898, 903 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd).  Absent a proper request, the trial judge does not err by failing to instruct the jury on the defense of mistake of fact. *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998).

[39] 966 S.W.2d 57 (Tex. Crim. App. 1998).

[40] *Id*. at 62.

defensive jury instructions the party wants and why he is entitled to them.[41]    Because

appellant failed to tell the trial judge what specific fact he was mistaken about, he was not

entitled to an instruction on this defensive issue.[42]

Second, even if appellant had thought that the officers were out to harm or lynch him

and his wife (rather than arrest him), that belief was not a reasonable one.  The statutory

mistake-of-fact defense explicitly requires that the defendant's mistaken belief about the

existence of a fact is a "reasonable" one "that would be held by an ordinary and prudent man

in the same circumstances as the actor."[43]   Although the "reasonableness" of a mistaken

belief is generally a question for the jury,[44] appellant cannot rely upon evidence of his

paranoia and psychotic thinking to raise a "reasonable" mistaken belief concerning the

officers' intentions.[45]   The law examines "reasonableness" from the perspective of an

---

[41] *Id*. at 63; *see also Tolbert v. State*, ___ S.W.3d __, ___, No. PD-0265-09, 2010 WL 935377, * 2 n.6 (Tex. Crim. App. March 17, 2010) ("Our decision in *Posey* was intended "to discourage parties from sandbagging or lying behind the log" and to discourage a defendant from retrying the case on appeal under a new defensive theory, effectively giving the defendant "two bites at the apple.").

[42] *See Goodrich*, 156 S.W.3d at 147-48.

[43] Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 1.07(42); *see Winkley v. State*, 123 S.W.3d 707, 712 (Tex. App.—Austin 2003, no pet.) (citing *Bang v. State*, 815 S.W.2d 838, 841 (Tex. App.—Corpus Christi 1991, no pet.)).

[44] *See Granger v. State,* 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) ("Whether appellant's mistaken belief was 'reasonable,' so as to comport with the requirements of § 8.02, should have been left for the jury to decide as trier of fact.").

[45] *See, e.g., King v. State*, 919 S.W.2d 819, 821-22 (Tex. App.—El Paso 1996, no pet.) (defendant not entitled to instruction on mistake of fact when he testified that he thought his wife was dead at the time he choked her with an electrical cord because any such belief was manifestly

ordinary and prudent person, not from that of a paranoid psychotic who is, by psychiatric

definition, "unreasonable" in his imagined suspicions, delusions, and fears. Mental disease

is not an attribute of the reasonable, ordinary and prudent person. Thus, although the general

rule is that the jury must determine the relative credibility of the evidence raising a

"reasonable belief" about a fact, reliance upon paranoid beliefs and delusions negates the

type of reasonableness that an ordinary and prudent person would have under the

circumstances.[46]

Third, any mistake of fact that appellant might have made about the officers'

intentions or their right to arrest him did not negate the kind of culpability required for the

commission of capital murder. The culpable mental state in section 19.03(a)(1) applies to

the intentional or knowing murder of a peace officer whom the actor knows is a peace

officer.[47] To prove either capital murder or aggravated assault of a peace officer, the State

must show that the peace officer is "acting in the lawful discharge of an official duty," but

---

unreasonable, as an ordinary and prudent person could and would have easily verified that fact first);
*See People v. Mejia-Lenares*, 135 Cal. App. 4th 1437, 1454, 38 Cal. Rptr. 3d 404, 415 (Cal. Ct. App. 2006) (stating that a mistake-of-fact defense "cannot be predicated upon delusions which are the product of mental illness.").

[46] *Id*.

[47]T EX. PENAL CODE § 19.03(a)(1) (murder of a peace officer requires proof that the defendant committed murder as defined in section 19.02(b)(1) and "the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman").

the defendant need not know that specific fact.[48] Thus, any mistake that appellant might have made about what the officers' intentions were, or whether they were acting in the lawful discharge of their official duty in arresting him, would not negate the required culpability for capital murder.[49]

For all of these reasons, we overrule appellant's seventh point of error.

## D.    Justification Instructions

In appellant's eighth point of error, he claims that the trial judge erred in refusing to instruct the jury on a variety of justification defenses, including necessity, "defense of home and property," and defense of another. As with point of error seven, appellant has forfeited any error on appeal because he failed to specify what facts or legal theory would support submission of any of these defenses.[50] Merely submitting a multi-page list of bare-bones

---

[48] *See Salazar v. State,* 643 S.W.2d 953, 956 (Tex. Crim. App. 1983) ("[A] conviction [for aggravated assault on a peace officer] does not depend on whether the arrest was legal, or the defendant's belief about its legality. . . . [W]hile the State must still prove the defendant knew or had been informed that he was assaulting a peace officer, proof that he also knew the officer was 'lawfully discharging an official duty' is unnecessary"); *see also Montoya v. State*, 744 S.W.2d 15, 30 (Tex. Crim. App. 1987), *overruled on other grounds*, *Cockrell v. State*, 933 S.W.2d 73 (Tex. Crim. App. 1996) (evidence in a capital-murder trial that the police officer was making an unauthorized warrantless arrest did not disprove that the officer was in the lawful discharge of an official duty).

[49] *See id.*

[50] *See Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) ("As regards specificity [of an objection], all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." ); *Starks v. State*, 127 S.W.3d 127, 133 (Tex. App.—Houston [1ˢᵗ Dist.] 2003, pet. dism'd) (to preserve a complaint about the trial court's failure to instruct on self-defense, a defendant must make a timely objection that specifically states the legal basis for the objection);

objections to the failure to include various statutory defenses and affirmative defenses does not sufficiently direct the trial judge's attention to the specific facts or theory supporting submission of such a charge.[51] As this Court noted almost one-hundred years ago, a defendant who files a laundry-list of written objections to the charge must also specify the legal or factual reasons why he believes himself entitled to such special instructions.[52] Unexplained lists of objections and requests for instructions risk being considered "sandbagging" objections that fail to preserve any issue for review.[53]

Second, this point of error is multifarious because it raises more than one specific

---

*Williams v. State*, 930 S.W.2d 898, 903 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (defendant's bare request for an instruction on mistake of fact was too general to preserve error because he failed to comply with art. 36.14 and "distinctly specify" what fact he was purportedly mistaken about).

> Appellant's objections were as follows:
> The Defendant objects to the Court's failure to instruct the jury on the law of defense of another.
> The Defendant objects to the failure to instruct the jury on the law of defense of home and property.
> The Defendant objects to the Court's failure to instruct the jury on the law of necessity.

[51] Appellant filed an eight-page laundry list of bare-bones objections to the jury charge.

[52] *Wilson v. State,* 189 S.W. 1071, 1072 (Tex. Crim. App. 1916) ("Appellant filed with the judge several grounds of objections to his charge. He also requested some 11 special charges, all of which were refused, except the one to disregard the second and third counts above mentioned, which was given. In neither requested charge, nor in any way connected therewith, did he give any reason or statement why it should be given. This is essential in even a felony case.").

[53] See TEX. CODE CRIM. PROC. art. 36.14 (stating that, before the court's charge is given to the jury, "the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing, distinctly specifying each ground of objection. Said objections may embody errors claimed to have been committed in the charge, as well as errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts."). This article requires the defendant to "distinctly specify" the ground–or basis–of his objection to the charge and the ground–or basis–for any requested instructions that arise from the facts in evidence. *See Williams,* 930 S.W.2d at 903.

complaint and risks rejection on that basis alone.[54]  In this single point, appellant has raised

a potpourri of complaints concerning the failure to give instructions on (1) necessity, (2)

defense of another, (3) defense of "home and property."

Third, appellant fails to acknowledge that each of these justification defenses requires

that the defendant reasonably believe that his conduct is immediately necessary to avoid a

greater harm.  As with the statutory mistake-of-fact defense, a "reasonable belief" is one that

would be held by an ordinary and prudent person, not by a paranoid psychotic.[55]  Appellant's

repeated claim that "his paranoid ideations and active psychosis" raise a "reasonable belief"

that his actions were justified is supported neither by law nor common sense.

Texas law does not recognize the "ordinary and prudent" paranoid psychotic for

purposes of Penal Code justification defenses.  The only affirmative defense available under

Texas law for those who commit crimes while suffering from an abnormal mental disease

---

[54] *See, e.g., Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex. Crim. App. 2000).

[55] *See* TEX. PENAL CODE § 9.22 (Necessity) ("Conduct is justified if the actor reasonably believes the conduct is immediately necessary to avoid imminent harm . . . ."); *id.* § 9.31 (Self-Defense) ("a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary . . . ."); *id.* § 9.32 (Deadly force in defense of a person) ("A person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . ."); *id.* § 9.33 (Defense of third person) ("A person is justified in using force or deadly force against another to protect a third person if, under the circumstances as the actor reasonably believes them to be . . . ."); *id.* § 9.41 (Protection of one's own property) ("A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary . . . .").

or defect is insanity under Section 8.01.[56] Appellant did not assert an insanity defense at trial,

and he cannot now claim entitlement to some other statutory defense based upon his mental

disease or defect.[57] Appellant argues that, even though the Penal Code "does not explicitly

contain and carry forward all of the traditional common law doctrines regarding

justification,"[58] we should expand upon the Penal Code to embody a free-standing "castle

doctrine" that would permit property owners to kill police officers who come on their

---

[56] TEX. PENAL CODE § 8.01 ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.").

[57] *See Jackson v. State*, 160 S.W.3d 568, 572 (Tex. Crim. App. 2005) ("Texas law does not recognize a lesser form of the insanity affirmative defense."). Appellant attempts to analogize his case to *Darty v. State*, 994 S.W.2d 215 (Tex. App.—San Antonio 1999, no pet.). In that case, the defendant testified that, during a traffic stop, the policeman threw him on his neighbor's car, beat him with his flashlight, and placed him in a choke hold. *Id.* at 218. The defendant denied kicking the officer, but admitted that he used some force to escape the chokehold because he could not breathe. *Id.* An ordinary and prudent person in the same situation might have thought this use of force was reasonable. But there was no evidence in *Darty* that the defendant was psychotic or paranoid or otherwise acting under unreasonable delusions of persecution.

The present case is analogous to the situation in *Zwack v. State*, 757 S.W.2d 66 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd), in which the court of appeals held that the defendant–who claimed that he had paranoia and delusions of persecution–was not entitled to an instruction on self-defense. In *Zwack*, the defendant was charged with attempted capital murder of a police officer for shooting the officer who had pulled his truck over. Zwack entered a plea of insanity but also requested a jury charge on "self defense based on an insane delusion." The court of appeals noted, "There was strong evidence that Appellant was suffering under a paranoid delusion that he was being 'ambushed' by police officers who intended to kill him," rather than simply arrest him. *Id.* at 70. But, as the court noted, even if the circumstances as perceived by the defendant were true, he would not be entitled to a self-defense instruction because he had failed to offer any evidence that his use of force was justified, a "reasonable person" would not have retreated, and the deadly force was immediately necessary to protect the defendant from the other's use of unlawful deadly force. *Id.* The same is true here: appellant's use of force was not justified; a "reasonable person" would have retreated (or surrendered); and the officers did not initially use unlawful deadly force against him. *See* TEX. PENAL CODE § 9.31.

[58] Appellant's Brief at 64-68.

property in response to a 911 "domestic violence-gunshots" call.  This we would decline to do even if we had the authority to create a nonstatutory justification defense.[59]

For all of the above reasons, we overrule appellant's eighth point of error.

**E.    Lesser-Included Offenses Raised by Mental-Health Evidence**

In his tenth point of error, appellant contends that the trial court erred by refusing to submit charges on manslaughter and criminally negligent homicide because a reasonable juror might draw various inferences that could support the notion that Appellant acted recklessly or negligently, rather than intentionally or knowingly.  Appellant notes that if any evidence, regardless of its strength or credibility, raises the issue that the defendant was guilty only of the lesser offense, then the charge must be given.[60]  He posits that a reasonable juror "might deem Appellant's act of shooting Officer Ogburn a reckless one, rather than the result of a conscious decision to commit an unlawful killing" because of appellant's psychotic paranoia.[61]  Alternatively, he argues that "the testimony of Dr. Vail, who diagnosed an active psychosis, Dr. Kessner, who found paranoid ideations and a thought disorder, combined with Officer Valentine's testimony describing how a strange look suddenly came

---

[59] *See Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) ("[B]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court concludes a defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction."); *Willis v. State*, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990).

[60] *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).

[61] Appellant's Brief at 80.

over Mr. Mays' face combine to raise the issue of a failure to perceive risk."[62]

The culpable mental state for capital murder, however, refers to the result of the conduct–a person's death–not to the nature of that conduct.[63]  That is, there must be some affirmative evidence,[64] from some source, that at the moment appellant shot Deputy Ogburn in the head with his deer rifle, he did not intend his death or know that it was reasonably certain to occur.[65]  Appellant fails to point to any evidence in the trial record that affirmatively shows that he was either reckless or negligent about the likelihood that a death would occur at the moment he shot Deputy Ogburn.  Indeed, appellant's very first words immediately after shooting the deputy were: "Where's the other one?  I'll take him out, where is he?"  At most, appellant's evidence of a mental illness or impairment might demonstrate some confusion about the circumstances surrounding his over-all conduct during the stand-off, but none of that evidence affirmatively shows that appellant did not intend to

---

[62] *Id.* at 82.

[63] *See Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994).

[64] *See Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003) (before one is entitled to an instruction on a lesser-included offense, there must be "affirmative" evidence "directly germane" to the existence of the lesser-included offense).

[65] *See Burnett v. State*, 865 S.W.2d 223, 229 (Tex. App.—San Antonio 1993, pet. ref'd).  In *Burnett*, the court of appeals explained,

> for a defendant to be entitled to a jury charge on involuntary manslaughter or criminally negligent homicide, the record must contain "some" evidence that the defendant did not intend the resulting death or know that it was reasonably certain to occur. If such evidence is present, the record must then be examined to see if it indicates whether the defendant was *aware* or *unaware* of the risk that his conduct could result in the unintentional killing of the deceased.

*Id*.

kill when he shot Deputy Ogburn.  Appellant's tenth point of error is overruled.

**Other Guilt-Stage Jury-Instruction Claims**

**A.    Sudden Passion and Provocation Instruction**

In his ninth point of error, appellant contends that the trial judge erred in failing to instruct the jury on the "traditional" defenses of sudden passion and provocation.  He asserts that "[s]udden passion and provocation have always reduced the degree of criminal culpability in Texas."[66]  Thus, the Legislature did not have the authority to eliminate the issues of "sudden passion" and "provocation" during the guilt phase of a capital-murder trial.[67]  He relies upon an 1895 case, *Larson v. State*,[68] and a 1903 case, *Vann v. State*,[69] for the proposition that those cases placed "little, if any, reliance on any statutory or constitutional provision" in stating that the defendants were entitled to jury instructions on manslaughter.[70]  In both of those cases, however, this Court did rely upon extant statutory

---

[66] Appellant's Brief at 75.

[67] In the 1994 Penal Code revisions, the Texas Legislature repealed the former voluntary manslaughter statute and made sudden passion an issue to be considered at the punishment stage of a murder trial.  *See Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). But evidence of "sudden passion" or provocation is admissible and relevant to the mitigation issue.  *See Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000) ("The Legislature, through its broad power to classify crimes and those who stand accused of crimes, chose not to permit the defense of "sudden passion" in the context of capital murder"; stating that "the issue of 'sudden passion' could be considered only as a mitigating circumstance for the jury when deciding the second punishment issue.").

[68] 29 S.W. 782 (Tex. Crim. App. 1895).

[69] 77 S.W. 813 (Tex. Crim. App. 1903).

[70] Appellant's Brief at 75.

law, explicitly in *Larson* and implicitly in *Vann*.[71]

There is no free-floating, non-statutory, common-law right to an instruction on sudden passion and provocation in a capital-murder trial. We have previously rejected appellant's contention,[72] and his present arguments fail to persuade us that the Texas Legislature did not have authority to eliminate the former statutory offense of "sudden passion" manslaughter from consideration in the capital-murder context. We overrule point of error nine.

## B.    Constitutionality of "Lawful Discharge of an Official Duty"

In his eleventh point of error, appellant claims that the aggravating element of capital murder–the intentional killing of a peace officer "who is acting in the lawful discharge of an official duty"–is unconstitutionally vague. At trial, appellant moved for a directed verdict claiming that the evidence was insufficient to prove that the officers were discharging an official duty, and he objected to the trial court's failure to define the phrase "acting in the lawful discharge of an official duty." He does not cite to any portion of the trial record where he asserted that the phrase was "unconstitutionally vague." Appellant did not make this

---

[71] *See Larson*, 29 S.W. at 783 (holding that "it has been held by this court that the adequate causes laid down *in the statutes* to create such passion . . .") (emphasis added); *Vann*, 77 S.W. at 816 ("Appellant contends, and we think correctly, that he had the right to have a charge on manslaughter, unfettered by a charge on provocation with the apparent intention to kill; and also that, *under the law and the facts*, he was entitled to a clear and unequivocal charge on self-defense, unlimited by the law in regard to provoking a difficulty.") (emphasis added).

[72] *See Wesbrook*, 29 S.W.3d at 112-13 ("The Legislature is vested with the lawmaking power of the people in that it alone 'may define crimes and prescribe penalties.' . . . The Legislature, through its broad power to classify crimes and those who stand accused of crimes, chose not to permit the defense of "sudden passion" in the context of capital murder.").

constitutional vagueness argument in the trial court; therefore, his complaint is not preserved for review.[73]

At any rate, the term is not unconstitutionally vague.  As we have previously stated in *Montoya v. State*,[74] another capital-murder case,

> Whether [the deceased police officer] was making a lawful arrest is not relevant to determining if [he] was acting in the lawful discharge of his official duties. A police officer is still acting within the lawful discharge of his official duties when he makes an unlawful arrest, so long as he is acting within his capacity as a peace officer.[75]

More recently, we have repeated that "as long as the officer was acting within his capacity as a peace officer, he was acting within the lawful discharge of his official duties."[76]  It is undisputed in this case that all of the officers involved, beginning with Deputies Valentine, Sanders, Ward, Ogburn, and Habelt, were acting in the lawful discharge of their duties as police officers.  Appellant may have felt that the officers *shouldn't* have responded to the 911 call or *shouldn't* have tried to arrest him, but he never suggested that these men were not police officers or that they were not acting within their capacity as police officers during the stand-off.

---

[73] See TEX. R. APP. P. 33.1(a)(1); *see also Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995) (appellant waived his challenge to statute as vague as applied because he did not specifically object at trial).

[74] 744 S.W.2d 15 (Tex. Crim. App. 1987), *overruled on other grounds, Cockrell v. State*, 933 S.W.2d 73 (Tex. Crim. App. 1996).

[75] *Id.* at 29; *see also Hughes v. State*, 897 S.W.2d 285, 297-98 (Tex. Crim. App. 1994); *Guerra v. State*, 771 S.W.2d 453, 460-61 (Tex. Crim. App. 1988).

[76] *Hall v. State*, 158 S.W.3d 470, 474 (Tex. Crim. App. 2005).

Furthermore, the phrase "lawful discharge of an official duty" is not statutorily defined, but it does have an ordinary meaning that jurors can apply using their own common sense:[77] The person killed was a police officer who was, at the time of his death, lawfully acting as a police officer. We overrule appellant's eleventh point of error.

## C.    The Trial Court's Instruction on Reasonable Doubt

In his sixth point of error, appellant complains that the trial judge "diluted" the reasonable-doubt standard in his instructions to the jury. At trial, he objected that the trial court failed to explain to the jurors that the reasonable-doubt standard is a "high burden of proof that may be set by each individual juror at any degree of certainty less than absolute certainty." He also objected that the jury instructions failed to instruct the jury on "preponderance of the evidence" and "clear and convincing evidence" and explain how those standards differ from proof beyond a reasonable doubt.

The trial judge instructed the jury as follows:

It is not required that the prosecution prove guilt beyond all possible doubt. It is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In *Woods v. State*,[78] we held that giving this same instruction to the jury in a capital-

---

[77] *See Daniels v. State*, 754 S.W.2d 214, 219 (Tex. Crim. App. 1988) (noting that, when words are not defined, they are ordinarily given their plain meaning unless the statute clearly shows that they were used in some other sense); *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979) (stating that, in the absence of special definitions, statutory language under attack as vague can be measured by common understanding and practices or construed in the sense generally understood).

[78] 152 S.W.3d 105, 115 (Tex. Crim. App. 2004); *see also Ochoa v. State*, 119 S.W.3d 825, 828-29 (Tex. App.—San Antonio 2003, no pet.) (collecting Texas cases holding that giving an

murder trial was not an abuse of discretion. Appellant cites *Woods*, but argues that we failed to include any discussion of *Victor v. Nebraska* in that case.[79] In *Victor*, the Supreme Court held that the standard of "beyond a reasonable doubt" is a due-process requirement in a criminal case, but that the Constitution neither prohibits trial judges from defining reasonable doubt nor requires them to do so.[80] Appellant fails to explain how *Victor* affects our reasoning in *Woods*. Both cases state that courts may or may not define the term "reasonable doubt." In Texas, we have said that it is "the better practice" not to define that term, and *Victor* does not suggest otherwise.[81] We overrule appellant's sixth point of error.

### Issues Relating to the Punishment Stage

**A.    Sufficiency of the Evidence to Support the Finding of Future Dangerousness**

In his fourteenth point of error, appellant contends that the evidence is insufficient to support the jury's finding on the future-dangerousness issue.[82] Appellant states that "[t]he crime facts in this case are not enough to sweep away the good in Mays'[s] life history" and

---

instruction regarding "all possible doubt" is not error).

[79] 511 U.S. 1 (1994).

[80] *Id.* at 5.

[81] *See Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000) (citing *Victor* and noting that "the better practice is to give no definition of reasonable doubt at all to the jury").

[82] In this point of error, appellant devotes much of his discussion to purported constitutional deficiencies in the future-dangerousness special issue. To the extent that appellant raises matters other than the legal sufficiency of the evidence to support the first special issue, we find this point of error multifarious and decline to address those matters. *See Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex. Crim. App. 2000). Further, arguments similar to those made by appellant were recently rejected in *Russeau v. State*, 291 S.W.3d 426, 433-34 (Tex. Crim. App. 2009).

that "[w]ith the tools and facilities at the disposal of Texas correctional personnel, it would be a rare prisoner indeed who could present much of a threat that would 'continue' over time." These arguments were presented to, but rejected by, the jury at the punishment stage.

The evidence at trial showed that appellant, without warning, suddenly turned from a calm, cool, and polite gentleman discussing matters with an inquiring deputy into a violent sharpshooter who intentionally killed two police officers and seriously wounded a third during an hour-long stand-off involving more than a dozen officers. The violence began when Deputy Valentine told appellant that he was under arrest; appellant refused to obey, listen to, or reason with an authority figure. His reaction to the exercise of authority by a law enforcement officer was violent. Appellant justified his murderous conduct by stating that he had been "mistreated" by the officers. The jury convicted appellant of capital murder, and its only two punishment choices were prison or death. Prison is a part of "society," and the future-dangerousness issue includes consideration of appellant's likely future behavior while in prison for life. The prison system is run by law enforcement and correctional officials, and any person sentenced to prison must obey those authority figures, regardless of whether they feel they are being "mistreated."

A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[83] Viewed in the light most favorable to

---

[83] *See Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Among those factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior

the jury's verdict, the circumstances of this offense, including the evidence that he

deliberately killed two police officers, as well as the evidence of appellant's prior

confrontations with authority figures, support a finding that there is a probability that

appellant would commit future acts of violence (quite possibly against authority figures) in

prison.[84]  We overrule appellant's fourteenth point of error.

## B.    Victim-Impact Evidence.

In his twelfth point of error, appellant raises six sub-issues: four relate to the trial

judge's refusal to give requested victim-impact instructions and two relate to the trial judge's

admission of victim-impact and victim-character evidence.

Regarding his instruction-based complaints, appellant argues that the trial judge

violated the Eighth and Fourteenth Amendments in refusing to explicitly limit the jury's

consideration of victim-impact evidence.[85]  Appellant claims entitlement to these instructions

---

criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Id.*  It is frequently said that "the circumstances of the offense itself 'can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue.'" *Druery v. State,* 225 S.W.3d 491, 507 (Tex. Crim. App. 2007).

[84] *See, e.g., Williams v. State*, 270 S.W.3d 112, 138 (Tex. Crim. App. 2008) (a jury could reasonably reject the defendant's claim that the commission of capital offense was merely a temporary departure from his usual "benign" crimes and find that he was incorrigible).

[85] Appellant's requested instructions were as follows:
(1)    "That its consideration of victim impact evidence should not be conducted in connection with the future dangerousness issue";
(2)    "That its consideration of victim impact evidence did not relieve the state of its burden to prove the 'future dangerousness' special issue beyond a reasonable doubt";
(3)    "To disregard victim impact evidence that was not shown to be within the knowledge or

based on *Mosley v. State*,[86] a case in which we urged trial courts "to place appropriate limits upon the amount, kind, and source of victim impact and character evidence."[87] The trial judge did not err in refusing the requested instructions.

First, appellant overstates the holding in *Mosley*. What was encouraged in *Mosley* was the use of Texas Rule of Evidence 403 to limit the introduction of victim-impact and character evidence in the first place, rather than the use of instructions to limit consideration of evidence that had already been admitted.[88]

Second, nearly identical claims were rejected in *Saldano v. State*.[89] There, the defendant had requested some twenty-five non-statutory punishment charges, including versions of the four instructions requested in this case, none of which were given by the trial court.[90] We stated,

> We believe it sufficient to dispose of these points by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges. These state statutory provisions meet federal constitutional requirements by narrowing the class of ''death-eligible defendants'' and they arguably provide more than required by

---

reasonable expectation of the defendant";

(4) "Not to make a comparative worth analysis of the value of the victims to their families and community compared to the defendant or other members of society."

[86] 983 S.W.2d 249 (Tex. Crim. App. 1998).

[87] *Id*. at 263.

[88] *Id.* at 262.

[89] 232 S.W.3d 77, 106 (Tex. Crim. App. 2007).

[90] *Id.*

the federal constitution by providing a jury a vehicle to ''fully'' consider mitigating evidence "in every conceivable manner in which the evidence might be relevant."[91]

The same is true in this case: The trial judge submitted a charge consistent with applicable state statutes.

We now turn to appellant's admission-based complaints. Appellant failed to preserve this issue for review because he did not object to the admission of the victim-impact or character evidence at trial.[92] Nevertheless, his claim is without merit. First, appellant asserts that the trial court let in far too much victim-impact evidence, exceeding the "quick glimpse" permitted by the Eighth Amendment. We review a trial court's admission of victim-impact and character evidence for an abuse of discretion.[93] The State called four witnesses to give victim-impact and character testimony: Deputy Ogburn's wife of thirty-six years, Pat Ogburn; his son, Tony Ogburn Jr.; Deputy Harris; and Deputy Valentine.

Mrs. Ogburn testified that her husband's death was "devastating." She explained that she has had medical issues since having a stroke in 1996, and her husband was her "sole

---

[91] *Id.* at 107 (citing *Cockrell v. State*, 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996) (footnote omitted)).

[92] *See* TEX. R. EVID. 105; *see Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (defendant failed to preserve any error regarding admission of victim-impact evidence because his objection at trial did not comport with complaint raised on appeal); *James v. State*, 772 S.W.2d 84, 101 (Tex. Crim. App. 1989), *vacated on other grounds,* 493 U.S. 885 (1989) (failure to object to victim-impact evidence waived review on appeal); *Barletta v. State,* 994 S.W.2d 708, 715 (Tex. App.—Texarkana 1999, pet. ref'd) (defendant's claim of erroneous admission of victim-impact testimony was not preserved for appellate review).

[93] *Mosley*, 983 S.W.2d at 262.

source . . . of everything."  Because of his death, she had to move closer to her siblings so that they could take care of her.  She said her husband was a man of faith who wanted nothing more than to "help the public."  He "truly believed in being a police officer.  That was his life."  Mrs. Ogburn's testimony took up slightly more than four pages of the record.

The next witness was Ogburn's son, Tony Jr.  He testified that he was very close to his dad, that they would talk every day, and that now he does not know who he "can call to talk to."  Tony Jr.'s main concern was that his dad was no longer there for his mom.  He also expressed sorrow that his seven children lost their grandfather.  Tony Jr. testified that his dad "liked talking to young people about the rights and wrongs of life, and just to try to help, you know, the younger generation." His testimony took up three pages of the record.

Deputy Harris then testified. He also described Deputy Ogburn's death as "devastating."  The deceased was his "go-to-guy" when his father had a terminal illness.  He said the two of them would talk every morning–a part of his day he knew he could enjoy. He described Deputy Ogburn as wise and willing to share that wisdom.  Deputy Harris's testimony took up slightly more than six pages of the record, but more than half of that concerned the impact of the injury he himself sustained when appellant shot him.

Similarly, Deputy Valentine described Deputy Ogburn as a confidant and role model. Since his death, "There's times I don't want to even come to work anymore."  Deputy Valentine described Deputy Ogburn as supportive, friendly, calming, and dedicated to his wife.  Deputy Valentine's testimony took up six pages of the reporter's record–some of

which concerned the impact of appellant's conduct of threatening him with a deer rifle.

Appellant notes that he did not know the Ogburn family or that Deputies Harris and Valentine were good friends of Deputy Ogburn's. Regardless, all of this testimony was admissible: This was evidence concerning the impact of the death of the victim named in the indictment (Tony Ogburn) on others, *i.e.*, Ogburn's close family and friends.[94] It was admissible to rebut appellant's mitigation case, regardless of whether "the defendant was ignorant of the specific facts regarding the victim's character or relationships."[95]

The victim-related evidence took up only a brief portion of the roughly 320-page punishment record. "Sheer volume" was not a factor in this case.[96] The four witnesses testified succinctly and without objection. The trial judge acted within his discretion in admitting these short bits of victim-impact and victim-character testimony.

Finally, appellant argues that the trial judge violated his constitutional and statutory rights by admitting "victim impact" evidence relating to those not named in the indictment, specifically Deputy Harris and Deputy Valentine. Appellant notes that Deputies "Harris and Valentine each testified in great details about their injuries, their losses, the changes in their lives, the changes in their family's lives as a result of this shooting incident." Appellant relies

---

[94] *Haley v. State,* 173 S.W.3d 510, 517 (Tex. Crim. App. 2005).

[95] *Williams*, 273 S.W.3d at 220.

[96] *Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002).

on *Cantu v. State*,[97] in which we held that admission of victim-impact and character evidence is proper only as to the "victim" for whose death the defendant is being tried, not a second victim killed in the same transaction.[98]

Deputies Harris and Valentine did provide classic victim-impact testimony (relating to the impact Ogburn's death had on them), but the testimony about their *own* injuries and losses was admissible as same-transaction testimony.[99]  None of that testimony falls into a class of evidence this court has traditionally disfavored: third-party testimony about the impact of an extraneous offense (even one occurring during the same transaction) involving a victim not named in the indictment.[100]  No third person testified about the impact of Deputy Harris's or Deputy Valentine's injuries upon that third person.  Because the trial judge acted well within his discretion regarding the admission of victim-impact and character evidence and did not err in refusing the requested charges, we overrule point of error twelve.

## C.     Jury Argument

---

[97] 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).

[98] *Id.*

[99] *Ford v. State*, 919 S.W.2d 107, 116 (Tex. Crim. App. 1996); *Garcia v. State*, 126 S.W.3d 921, 929 (Tex. Crim. App. 2004) (medical records of injured bystander admissible over 'victim impact' objection; "While the records might have been irrelevant or inadmissible for other reasons, they were not irrelevant or inadmissible because they were victim impact evidence, as appellant claims").

[100] *See Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) ("'Victim impact' evidence is evidence of the effect of an offense on people *other* than the victim"; stating that "evidence of the effect of a different offense on *the victim*" is admissible); *compare Haley*, 173 S.W.3d at 518 (trial court erred in admitting victim-impact evidence relating to the extraneous offense of murder in the punishment phase of cocaine possession trial.).

In his second point of error, appellant complains that the prosecutors made "a series of egregiously improper remarks" during the closing arguments at the punishment stage. He asserts that the prosecutors "pitched a death sentence" based on appellant's mental illness, thus using it as a "two-edged sword" of aggravation instead of mitigation.[101] Appellant argues that mental illness and its effects upon one's conduct are, as a matter of law, mitigating and can never be considered as rendering a person more likely to commit acts of violence. That is not the law. Mental illness, like childhood abuse, is not mandatorily mitigating, although it is evidence that the jury must be able to consider and give effect to as it deems appropriate.[102] However, we will not review the propriety of the prosecutor's arguments, as appellant failed to object to those arguments at trial. He has failed to preserve any issue for appeal.[103] We overrule point of error two.

---

[101] The prosecutor argued, *inter alia*,

And this defendant, we know, gets violent under these circumstances. The Defense's own experts told you that they had concerns about this defendant because of the conditions they believe he's suffering from.

    If you believe he's paranoid and he believes that the guards are out to get him or the police officers are out to get him or just that people are out to get him, then, clearly, there's a risk of violence. There's a risk that he is going to act on those impulses. . . .

[102] *See Clark v. State*, 881 S.W.2d 682, 699 (Tex. Crim. App. 1994) (rejecting defendant's claim that evidence of childhood abuse was "'mandatorily mitigating.' Rather than mandating that certain evidence be considered mitigating, the sentencer must simply be allowed to fully consider and give effect to the evidence.").

[103] Tex. R. App. P. 33.1; *see Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) ("a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal. Any prior cases to the contrary such as *Montoya* and *Romo* are expressly overruled."); *see also Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (reaffirming the *Cockrell* rule).

## D.      Punishment-Phase Instructions to the Jury

### 1.      *Failure to include the statutory non-unanimity instruction*

In his fourth point of error, appellant complains that the trial court omitted statutorily required language from the mitigation-issue instructions.  He is correct.  The trial judge erred by failing to instruct the jurors that they need not agree on what particular evidence supports a finding on the mitigation special issue.  However, appellant failed to notice or object to this omission, and thus he may obtain a reversal of his sentence only if he shows that this error caused "egregious harm" with respect to sentencing, that is, that the defendant was deprived of a fair sentencing trial.[104]

We have recently found that the omission of the statutory non-unanimity instruction was harmless error under *Almanza*'s[105] "egregious harm" standard.  In *Young v. State*,[106] we stated that this instruction is not constitutionally required for purposes of the Texas special

---

[104] Appellant argues that one or more of his written objections to the charge should have alerted the trial judge to this omission, but nowhere in his laundry list of objections did appellant object to the omission of the language mandated by Tex. Code Crim. Proc. art. 37.071, §2(f)(3) (the trial judge shall instruct the jurors that, in answering the mitigation question, they "need not agree on what particular evidence supports an affirmative finding on that issue").  And none of his objections were likely to put the trial court on notice of his actual complaint.  His objections included: "The Defendant objects to the punishment charge as a whole because it fails to provide a vehicle for full and fair consideration of mitigating circumstances, rather than just some consideration," as well as general objections to the constitutionality of article 37.071 and the failure to instruct the jury that a single "holdout" juror could ensure a life sentence.

[105] *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985).

[106] 283 S.W.3d 854 (Tex. Crim. App. 2009).

issues.[107] In addressing the issue of harm, the Court explained that every single juror had to

agree that there were no mitigating facts or circumstances that called for a life sentence rather

than a death sentence.[108] Thus, if even one juror believed that there was some mitigating

fact–any mitigating fact–that called for a life sentence, that juror could not join in a verdict

in which the jury unanimously found that there was no mitigating circumstance.[109]

Appellant attempts to distinguish *Young* from the present case by contending that the

prosecutor in this case "repeatedly suggested that the defense was required to submit a single

mitigation theory."[110] In the record excerpts that appellant cites, the prosecutor simply

---

[107] *Id*. at 879.

[108] *Id*. at 879.

[109] *See id.* at 882 (Cochran, J., concurring) ("[I]t would be illogical to speculate that perhaps one or more of those jurors did find a mitigating circumstance but was so confused about the unanimity requirement that he thought that unless every juror agreed upon the same mitigating fact, his vote did not count. So he changed his vote. Such reasoning assumes that jurors would violate their oaths. We must, however, 'presume[ ] that jurors, conscious of the gravity of their tasks, attend closely the particular language of the trial court's instructions in criminal cases and strive to understand, make sense of, and follow the instructions given them.'") (footnote omitted).

[110] Appellant's Brief at 47. Appellant set out the prosecutor's offending argument as follows:
> Remember the testimony of [four of appellant's character witnesses]? That he's a nice guy. He's good with kids. He's good with animals. He's apparently the friendliest, most trusting guy they've ever met.
> And yet on the other hand, the Defense wants you to believe that he's some sort of paranoid psychotic. They can't have it both ways. You can't just throw all the defenses against the wall and see what sticks. There has to be–there has to be a theory here.
> If you're going to find that there's a mitigating circumstance to justify that the defendant doesn't receive the just punishment that he deserves, then, surely, the evidence should all show you that.
> You consider all the evidence. You don't just pick out the half of the evidence that you want.

Appellant points to other portions of the closing argument in which the prosecutor listed different

pointed out the inconsistencies in the evidence presented by the defense: appellant was a calm, friendly, likeable neighbor versus he was a paranoid psychotic. But the prosecutor never suggested or implied that the jury had to unanimously decide which defensive theory, if either, it chose to believe. Any individual juror could believe or disbelieve either theory; the prosecutor's thrust was that a juror could not simultaneously believe both because they were inconsistent.[111] In this case, as in *Young*,[112] the appellant has failed to show that he suffered "egregious harm" from the omission of the statutory non-unanimity instruction. We overrule his fourth point of error.

*2.    Other punishment-stage jury-instruction claims*

In points of error fifteen through twenty-one, appellant raises various other claims concerning the punishment-phase jury instructions.

In point of error fifteen, he claims that the trial judge erred in failing to submit issues on deliberation and provocation as those special issues previously existed in Texas statutes. In 1991, when the Legislature added the mitigation special issue, it deleted those dealing with deliberation and provocation because those matters were subsumed by the mitigation issue.[113]

---

mitigation theories that the defense had presented and stated, "All of those things are issues that he's just throwing up there, hoping that one of those, you're going to grasp a hold of and determine that's some sort of mitigating evidence."

[111] Of course, as the defense implied, they are not necessarily inconsistent. Witness Dr. Jekyll and Mr. Hyde.

[112] *Young*, 283 S.W.3d at 878-79.

[113] *See generally Powell v. State*, 897 S.W.2d 307, 314 (Tex. Crim. App. 1994) (discussing 1991 legislative changes to art. 37.071).

Any evidence that might show a lack of deliberateness on the part of the defendant or provocation by the murder victim can be fully considered as a mitigating circumstance under the current second special issue.[114] And if the evidence does show careful deliberation or the lack of provocation, that evidence may be considered under the future-dangerousness issue.[115]

In point of error sixteen, appellant argues that the trial judge erred by instructing the jury, as required by statute, that the definition of "mitigating evidence" limits the concept of mitigation to "evidence that a juror might regard as reducing the defendant's moral blameworthiness."[116] We have repeatedly rejected appellant's argument, and he fails to persuade us that these prior decisions were incorrect.[117]

In his seventeenth point of error, appellant contends that the trial judge erred in failing

---

[114] TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1).

[115] TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1); *see Sonnier v. Quarterman*, 476 F.3d 349, 367 (5th Cir. 2007) ("Though the 'deliberateness' special issue has been removed, the imposition of the death penalty under the amended article is not arbitrary, erratic, wanton, or freakish."); *Joiner v. State*, 825 S.W.2d 701, 704 (Tex. Crim. App. 1992) (in answering the "future dangerousness" special issue, the jury may consider, *inter alia*, "the calculated nature of the defendant's acts," "the forethought and deliberateness exhibited by the crime's execution," and "whether the defendant was acting under duress or the domination of another at the time of the offense").

[116] TEX. CODE CRIM. PROC. art. 37.071, §2(f)(4).

[117] *See Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997) ("Because the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged in by each individual juror, we conclude that Article 37.071 §2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness"); *see also Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999); *Jackson v. State*, 992 S.W.2d 469, 481 (Tex. Crim. App. 1999).

to define various terms and phrases–including "probability" and "continuing threat to society"– in the first special issue. Appellant acknowledges that we have repeatedly rejected this contention in prior cases,[118] and we are not persuaded by his arguments that those cases were incorrectly decided.

In his eighteenth point of error, appellant complains that the trial judge failed to instruct the jurors that they could return a life sentence even if they concluded that their honest answers to the two special issues would require the trial judge to sentence the defendant to death. He argues that the Eighth Amendment "require[s] the trial court to empower the jury with a vehicle capable of giving effect" to the evidence.[119] Appellant cites no precedent for his proposition that the jury must have "unfettered sentencing discretion" to impose a life sentence even though the law and the facts, as viewed by each and every juror, would require a sentence of death. The Supreme Court has held that such unbridled discretion is not required by the constitution.[120] Furthermore, appellant has not shown any theory for obtaining a life sentence that is outside the scope of the special issues. And he failed to raise this specific claim in the trial court,[121] thus his sentence could be reversed only

---

[118] *See, e.g., Ladd v. State*, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999) (trial court need not further define the terms in the "future dangerousness" issue because the jury is presumed to understand them); *see also Russeau v. State*, 291 S.W.3d 426, 434 (Tex. Crim. App. 2009); *Renteria v. State*, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006).

[119] *Smith v. Texas*, 543 U.S. 37, 45 (2004).

[120] *Johnson v. Texas*, 509 U.S. 350, 362-63 (1993).

[121] On appeal, he points to his charge objections 16 and 17, which deal with the trial court's failure to define certain terms; they do not deal with the specific issue that he presents on appeal.

if he established error and that error caused egregious harm.[122]  He has failed to show either error or egregious harm.

In his nineteenth point of error, appellant claims that the "10-12 Rule" violates the rights of "lone, minority, and dissenting jurors" who would effectively lose their voting rights.  He argues that jurors must be told of their right to "veto death" by refusing to return any verdict during the sentencing stage.  We have previously held that the "10-12 Rule" is constitutional and that no Supreme Court precedent requires the trial judge to inform the jurors of the effect of a "holdout" juror.[123]  On appeal, appellant couches his complaint in terms of the constitutional right of jurors, rather than the rights of the defendant.  He never brought that argument to the trial judge's attention; thus, we decline to address that aspect of his claim.

In his twentieth point of error, appellant claims that the trial judge's instruction that the jurors shall "consider all evidence . . . that militates for or mitigates against the imposition of the death penalty" unconstitutionally permits "vague and overbroad aggravators and other irrational procedures to impose capital punishment."[124]  We have previously rejected these arguments, and appellant fails to persuade us that we were incorrect in doing so.[125]

---

[122] *Almanza*, 686 S.W.2d at 171.

[123] *See, e.g., Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Shannon v. State*, 942 S.W.2d 591, 600-01 (Tex. Crim. App. 1996).

[124] Appellant's Brief at 128.

[125] *See Luna v. State*, 268 S.W.3d 594, 609-10 (Tex. Crim. App. 2008), *cert. denied*, 130 S.Ct. 72 (2009); *Scheanette v. State*, 144 S.W.3d 503, 507-08 (Tex. Crim. App. 2004).

In his twenty-first and final point of error, appellant claims that the trial court erred in refusing to assign a burden of proof to the State in the mitigation-issue instructions. This Court has consistently held that, under Texas statute, the State does not bear any burden of proof in the mitigation issue and that the statute setting out that issue and instructions is constitutional.[126] We decline appellant's invitation to overrule established law.

We overrule points of error fifteen through twenty-one.

Having reviewed all of appellant's claims, we find that none of them require reversal of the jury's verdict, and we therefore affirm the trial court's judgment and sentence.

Delivered: April 28, 2010

Publish

---

[126] *Whitaker v. State*, 286 S.W.3d 355, 370 (Tex. Crim. App. 2009); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008).