Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio




# MEMORANDUM OPINION

No. 04-11-00359-CR

Robert **GUTIERREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR11455
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:   Catherine Stone, Chief Justice
Karen Angelini, Justice
Rebecca Simmons, Justice

Delivered and Filed:  March 14, 2012

AFFIRMED

After a bench trial, Robert Gutierrez was found guilty of murder and was sentenced to life imprisonment. In one issue on appeal, he argues that the evidence was insufficient to support his conviction. We affirm.

In a federal due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443

U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The court of criminal appeals has explained that this standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames*, 353 S.W.3d at 860. Therefore, on appellate review, we determine whether based on "cumulative force of all the evidence" the necessary inferences made by the trier of fact are reasonable. *Id.* We conduct this constitutional review by measuring the evidentiary sufficiency with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*

At trial, Gutierrez's neighbors testified that late in the evening on August 19, 2009, they heard people fighting in Gutierrez's apartment. According to one neighbor, he saw a man pounding on Gutierrez's apartment door:

> The yelling and the pounding were a lot of, "Let me in," with a lot of expletives. You know, "Open the door, "Open the freaking door," kind of stuff. And then it turned calm. "Come on, baby, let me in. It will be all right." That sort of – that kind of stuff. Very back and forth on the emotional scale. . . . I heard pounding on the door, "Open the door right now." That kind of stuff. "I will kill you if you don't open the door. And then calming down immediately, "Come on, baby, open the door. It will be all right. Just let me in." And right back to the pounding and screaming and hollering kind of stuff.

Another neighbor testified that he was watching a movie inside his apartment when he heard a man outside yelling, "Open up. Open the f-cking door." The neighbor heard the man yell, "If you don't open the door, I'll kill you." In response to the yelling, the neighbor called the police complaining about the noise. About thirty minutes later, the neighbor heard thumps coming from outside his apartment. Then after a while, he heard a woman say, "Please stop." According to the neighbor, he heard the female voice say "please stop," more than five times. The neighbor called the police again and met the police officers when they arrived at the apartment complex. He took

them to Gutierrez's apartment. The officers knocked on the doors and windows of the apartment, and shined a flashlight inside a window. No one inside the apartment responded. The officers told the neighbor there was not much else they could do because they did not hear anything at that moment. The neighbor went back inside his apartment to finish watching his movie. He was getting ready to go to bed when he saw the flashing lights outside from the EMS and squad cars.

A 911 operator testified that at 1:29 a.m. on the day of the murder, a 911 call was placed from Gutierrez's apartment. On the recording, a male caller states he wanted to report that "someone had just passed away at his residence and that she had drank too much." The caller then states that the woman was about fifty-eight years old and that the caller had also been drinking. When Gutierrez testified in his own defense, he admitted to having made this 911 call. However, he remembered reporting a murder. He could not explain why the 911 recording was not consistent with his memory.

In response to the 911 call, officers were dispatched to Gutierrez's apartment where they found the body of Sandra Barrios lying on the living room floor. She had been badly beaten. Gutierrez was sitting at a small table in the dining room. The officers placed Gutierrez in handcuffs while they performed a security sweep of the apartment. They did not find anyone else in the apartment, but they did find a bloody walking stick in a closet. Gutierrez was then taken to the police station. While Officer Naylor was sitting in the front seat of the patrol car writing his report, he heard Gutierrez mumbling to himself. According to Officer Naylor, Gutierrez all of a sudden blurted out, "I finally got that B out of my F-ing apartment. Y'all ain't going to get me. I'm too strong." Another officer, Officer Martinez, testified that when Gutierrez arrived at the police station, he put Gutierrez into an interrogation room and guarded the door. According to Officer Martinez, Gutierrez tried to open the interrogation room door, and when he could not,

screamed and kicked the door. Officer Martinez then had to go inside the room and calm Gutierrez down. A few minutes later, Gutierrez began screaming and kicking the door again. So, Officer Martinez had to go into the room and sit with Gutierrez.

At trial, the medical examiner testified about how Sandra Barrios died. According to the medical examiner, Barrios suffered from more blunt force injuries than she had ever seen on a body. Barrios had many, many blunt force injuries, and a few stab wounds or sharp force injuries. Indeed, of her twenty-four ribs, seventeen of them were broken. Many of Barrios's injuries were consistent with being struck with a rod-shaped instrument. The injuries to her head were blunt force type injuries and were caused by something relatively broad and flat. The medical examiner testified that such an object could have been a brick, a foot, or a board. Barrios also had either defensive-type injuries to her hand, or she was stepped on while lying on the ground. The medical examiner testified that Barrios was conscious at time the time the wounds were inflicted and her internal injuries were consistent with someone jumping on her or stomping on her. The medical examiner further testified that most of the extensive beating to the body was bruising and that the "little stab wounds may have produced a little bit of blood." There was also testimony that Barrios's DNA was consistent with blood found on the gray T-shirt and blue shorts Gutierrez was wearing at the time of his arrest. Barrios's DNA was also consistent with blood dried on Gutierrez's ankle and blood found on a large walking stick located in Gutierrez's closet. Her DNA was also consistent with blood spattered on the wall of Gutierrez's living room. Further, there was male DNA found underneath Barrios's nails. However, there was not a sufficient sample to make any further determination.

Barrios's ex-husband also testified at trial. He had seen Barrios on the Sunday before the murder. According to her ex-husband, Barrios had been dating Gutierrez, and said that she was worried and afraid because Robert had "a really severe temper" and could be violent.

Robert Gutierrez testified in his own defense. He testified that he was forty-six years old and had been diagnosed as a paranoid schizophrenic at Shoal Creek Hospital in 1985. He had known Barrios for two years. On the day of the murder, he went to pick Barrios up at 7:30 p.m. According to Gutierrez, he had been drinking, and Barrios had also been drinking.[1] Around 9:30 p.m., they went to Gutierrez's apartment. They listened to the radio, drank, smoked cigarettes, and talked. Gutierrez testified that about an hour later, he remembered going to the restroom. When he came out of the restroom, he saw a flashlight in the window and saw a flashlight come to the door. According to Gutierrez, he said to himself, "Oh, I need to go answer that and see who that is." But, "after that [he didn't] remember anything else. [He] did open the door and that was it. And then [his] mind went blank." When asked whether something happened to cause him not to recall the events of that night, Gutierrez testified, "No, my mind just went blank." Gutierrez testified when he came to, he was on the couch. He then noticed Barrios was lying on the floor. He noticed that her hair was on her face and there was blood in her face, but testified that he did not remember what had happened to her. According to Gutierrez, he was scared and knelt down to see if she was alive. When she did not appear to be alive, he called 911. When asked why he said what he did in the squad car, Gutierrez testified that he would never have said anything like that because he loved Barrios. Gutierrez admitted that the bloody walking stick belonged to him and was in his closet. He had no idea what the noises were that the neighbors claimed to have heard before the police showed up. According to Gutierrez, he and Barrios had not argued that night. He concluded that the neighbors must be lying.

---

[1] The medical examiner testified that Barrios had a substantial blood-alcohol level at the time of her death.

Gutierrez argues there is insufficient evidence to support his conviction because no motive was shown. However, motive is not an element of the offense of murder. *See Brock v. State*, 275 S.W.3d 586, 590 (Tex. App.—Amarillo 2008, pet. ref'd). Gutierrez also argues that no murder weapon was found. This statement, however, is not correct as the police did uncover a bloody walking stick, which the medical examiner testified was consistent with some of Barrios's injuries. The examiner also testified that some of Barrios's injuries were consistent with being caused by something other than a traditional murder weapon as her injuries were consistent with being stomped on. Gutierrez also argues that he is a diagnosed paranoid schizophrenic and thus could not have formed the requisite intent to cause the death of Barrios. However, there was no evidence presented that his mental illness impaired his culpable mental state. *See Mays v. State*, 318 S.W.3d 368, 380-82 (Tex. Crim. App. 2010). Finally, Gutierrez argues that if he were the perpetrator, he would have been covered in blood and there would have been more of the victim's blood on him than there was. However, there was no evidence that the perpetrator would have necessarily been covered in Barrios's blood. Indeed, the amount of Barrios's blood found on Gutierrez was consistent with the medical examiner's testimony.

In viewing all the evidence in the light most favorable to the trial court's finding of guilt, we conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We therefore affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish