**AFFIRM; Opinion Filed March 18, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01396-CR

### SERGIO VALENCIA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause No. F06-00598-K**

## MEMORANDUM OPINION
Before Justices O'Neill, Myers, and Brown
Opinion by Justice Brown

Sergio Valencia appeals his conviction for engaging in organized criminal activity through the underlying offense of aggravated assault with a deadly weapon, for which the trial court sentenced him to fifty years in prison. *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011); *id.* § 71.02(a)(1) (West Supp. 2013). In three points of error, appellant contends he was harmed by errors in the jury charge and that the trial court lacked jurisdiction to hear his case. We affirm.

### I. Background

The underlying offense in this case involved the aggravated assault of a sixteen-year old boy named Jacob Orta, who died after the attack. On the night of May 14, 2005, Jacob and his friend Bobby had been hanging out at Bobby's brother's apartment when they decided to walk to

a gas station to buy snacks. As they were walking back, six or seven guys came out from behind a church, formed a circle around the boys, and asked the boys if they were in a rival gang. Bobby saw that one of the guys was holding a bat. The boys denied being members of a gang, but the group attacked them. Bobby said he was hit in the elbow with the bat and was punched in the face and head. He did not see the group hit Jacob because once the hitting started, he and Jacob ran off in opposite directions. Bobby heard some footsteps chasing him, but he made it back to his brother's apartment where he asked his brother and Jacob's brother to help Jacob. Bobby then fell to the floor because of the pain to his head and elbow. Bobby testified that all the guys were acting together and that none of them tried to stop anyone from hitting them. Bobby could not remember what any of the guys looked like other than that they were Hispanic.

Appellant was certified by the local police department as being a member of a gang called "Brown Pride Locos 13" or "Brown Pride." Five of the other guys—Agustin Aviles, Daniel Luna, Jose Mercado, Sergio Guerrerro, and Ramon Valencia (appellant's younger brother)—also were recognized as members of that gang. The seventh guy was Michael Cruz, who claimed membership in a gang called "Barrio 13." On the night of the underlying offense, the guys had been hanging out with four girls—Denise Salazar, Denise's older sister Jovanna Salazar, Marisa Cordova, and Lauren McPeak. The girls were present at the time of the assault. Denise, Jovanna, and Marisa each testified at appellant's trial.

According to Denise, the girls met up with the guys at a gas station after receiving a telephone call from Michael. Marisa was driving the girls in her mother's Ford Explorer. Although there was some talk about going to a party, they left the first gas station and went to a second gas station. The girls used the restroom at the second gas station, and when they returned, the guys were arguing with "some other guy, at another pump." The argument ended

when an object was thrown and everyone drove off.  Appellant was driving a burgundy Titan with Agustin, Daniel, Jose, and Ramon.  Michael and Sergio G. joined the girls in the Explorer.

Denise testified that the group then went to a park.  As the group discussed going to the party, Denise heard someone say, "let's go [mess up] some Cheese Siders," which was a derogatory name for a rival gang, known as "East Siders."  Denise said the girls did not want "to be a part of it" but that they "didn't scream out and tell them no."  Denise added that the guys "didn't care what [they] were talking about."

When they left the park, Marisa, driving the Explorer with the girls, Michael, and Sergio G., followed appellant with the other guys in the Titan.  Appellant drove down the street and into an alley that circled around a church.  Denise saw two boys, who she later learned were Jacob and Bobby, walking down the street on the same side as the church.  The Explorer pulled into the alley and parked behind the Titan.  Denise said "[e]verybody was talking" but that the "girls waited for a while just to see what was happening there."  She testified that all the guys got out of the Titan and Michael and Sergio G. got out of the Explorer, and the guys headed toward the street.  The girls stayed in the Explorer.

Denise testified she heard a lot of arguing and that she, Jovanna, and Marisa got out of the Explorer to see what was happening.  Denise saw Bobby running away with Michael and Sergio G. chasing him.  The other guys were fighting with Jacob.  She also saw Agustin and Daniel with baseball bats.  Denise said the guys were punching Jacob, hitting him with the bats, and stomping on him with their feet.  Denise heard them screaming at Jacob about Jacob being a member of the East Side gang and Jacob denying the affiliation.

Denise said the guys stopped hitting Jacob because the girls were screaming at them and telling them to leave Jacob alone.  Denise testified that around that same time, Michael and

–3–

Sergio G. returned from chasing Bobby. She said Michael and Sergio G. told the guys they "took it too far."

After the fight, the guys jumped into the Titan and "burned off." The girls, Michael, and Sergio G. left in the Explorer. Denise said that as they drove off, she could see Jacob in the middle of the street. Jacob was twitching, and blood was coming from his head. Although she "felt horrible," she did not stop to help Jacob. She said Michael and Sergio G. told them to "go, go, go" and that "we're in trouble, we are going to get in trouble" if they stopped.

Denise continued to hang with these guys after this happened. She testified that Agustin told her that the girls "better not say nothing or else something would happen, something bad" so she hung out with them because she was scared. She also did not talk to the police until officers came to talk to her at her school. Denise testified that when they left the park, she did not know where they were going; she was told they were supposed to go to a party. She also did not know why the Titan pulled into the church alley or what was going on when everyone got out of the vehicles.

Marisa testified that she was driving the Explorer that night. She said that after the fight broke up at the second gas station, appellant asked if they wanted to go to a party. The girls said yes, so they followed appellant in the Titan because they did not know where to go. As she was following appellant, they passed two boys walking down the street. Appellant then turned into what she called a "complex," and she pulled up behind him. Marisa said that everybody got out of the Titan, and they got out of the Explorer. She did not know why they had stopped nor did she ask anybody about it. She also did not know what was going on.

Marisa remembered seeing three baseball bats; appellant had a bat in his hand. She testified that the guys started running up to the boys she saw walking. She stayed on the sidewalk with Denise, and Lauren and Jovanna were a few feet behind them. From the sidewalk,

Marisa saw the guys surrounding Jacob and yelling at him. Sergio G. chased after the "other kid." Appellant hit Jacob in the head with a bat, and Jacob fell down. The guys then "started beating him with the bats and their fists and with their feet" for three to five minutes. Marisa was unable to move or speak; she was "completely paralyzed from what [she] was looking at." When they were done, the guys ran past her, and Denise told her that they had to go. She could see Jacob in the middle of the street with blood coming out of his mouth and head as she drove off.

Marisa testified she did not stop to help Jacob because Michael told her to go. She said she "told them we had to go back" and that they "couldn't leave him there," but she was told to keep going. She listened to them because she was scared. Marisa hung with the guys at a house party just one other time after that night.

Jovanna testified to similar facts regarding the events of that night. Jovanna said appellant was the one who said "let's go find some East Siders" when they were at the park. She took his words to mean that he wanted to argue or fight, like the argument at the second gas station. She never thought, however, that the fight would go to the next level or that the guys would "take it as far as they did." When she heard appellant talk about finding East Siders, she testified that all of the girls "were like, no, no, no" and that they did not want to be a part of "[g]etting in trouble and fighting."

Jovanna said the group left the park in the two vehicles, with Marisa following appellant. Jovanna saw the two boys walking down the street. Appellant pulled in between two buildings, which she described as part of a church or complex. Jovanna heard a lot of back-and-forth yelling, but she did not know why they were there. Michael and Sergio G. got out of the Explorer and told the girls to stay. Jovanna testified that she specifically heard the group demanding to know if the boys were "East Side" and the boys denying it. Jovanna eventually

went with Marisa to see what was going on. As they walked toward the street, she saw the guys arguing with the boys and then they started punching Jacob. Michael and Sergio G. chased Bobby. Jovanna saw Agustin and Daniel with bats, and when Jacob fell to the ground after being hit with a bat, everyone started kicking him.

According to Jovanna, this lasted a couple of minutes but that it felt longer because the girls were crying. Marisa grabbed her, and they ran to the Explorer. At that point, she saw Sergio G. and Michael come back from chasing Bobby. She heard Sergio G. say that the guys had taken the fight too far. But Michael started hitting and kicking Jacob. Jovanna asked Michael what had happened, and he told her that it was "nothing." When she said they should stop, Michael told her they had "better not stop" and to "[j]ust keep going." Both Michael and Sergio G. yelled at them not to stop. Jovanna saw Jacob lying on the ground, and he appeared to be twitching. She said she wanted to stop but that they were scared. A week later, Sergio G. told the girls that Agustin said they "needed to keep [their] mouth[s] shut" and that if they said something, they "already know what's going to happen." Jovanna was Michael's girlfriend at the time, but they broke up a few months after the events of that night.

Both Denise and Jovanna admitted on cross examination that they had been told they were not going to be prosecuted for what happened that night. Marisa could not remember being told she would not be prosecuted. None of the girls admitted to being members of Brown Pride or Barrio 13. Nor were they initiated into the gang by sleeping with a gang member or participating in the events that night.

At the charge conference, appellant asked for an accomplice-witness instruction for Denise and Jovanna, arguing the evidence raises a fact issue related to those girls and therefore, the jury should consider the question of whether those girls were accomplices as a matter of fact. The trial court denied the request but agreed that they jury should consider the question for

–6–

Marisa. The jury was instructed that if it believed Marisa was an accomplice as the term was defined in the charge, it could not convict appellant solely on her testimony unless it believed there was other testimony in the case that connected appellant to the commission of the offense, if any.

The jury found appellant guilty of the offense, and after a punishment hearing, the trial court sentenced appellant to fifty years in prison. Appellant had been on probation for two other offenses in May 2005. The trial court determined the allegations in the State's motion to revoke probation and adjudicate appellant's guilt were true and sentenced appellant to ten years in prison for each case. The court ordered the sentences to run concurrently.

## II. Jury-Charge Error

Appellant's first and second points of error relate to alleged errors in the jury charge.

## A. Legal Standards

The purpose of the jury charge is to instruct the jury on the law that applies to the case and to guide the jury in applying the law to the facts of the case. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. art. 36.14 (West 2007) (trial court shall give jury "a written charge distinctly setting forth the law applicable to the case"). When reviewing claims of jury-charge error, we first determine whether an error actually exists in the charge. *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If error exists and appellant objected to the error at trial, reversal is required if the error was "calculated to injure the rights of [the] defendant," which means there must be "some harm" to the defendant from the error. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Barrios*, 283 S.W.3d at 350; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)*, superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988). If error exists and there is no objection to the complained-of error at

trial, we will not reverse for jury-charge error unless the record shows appellant suffered egregious harm as a result of the error. *Barrios*, 283 S.W.3d at 350. "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011). We assess harm in light of the entire jury charge, the state of the evidence, including contested issues, the arguments of counsel, and any other relevant information revealed by the record as a whole. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006).

## B. Accomplice-Witness Rule Instruction

Appellant argues in his first point of error that the trial court erred by failing to provide the jury an accomplice-witness instruction under article 38.14 of the code of criminal procedure for Denise and Jovanna Salazar. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) (explaining corroboration requirement for accomplice-witness testimony). He claims the evidence shows both girls were accomplices as a matter of fact, and the trial court's error harmed him because there was no other evidence connecting him to the commission of the underlying offense.

### 1. Applicable Law

In Texas, a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." *Id.* Because the rule requires corroboration of accomplice-witness testimony before a conviction may stand, the trial court must instruct the jury accordingly. *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013).

An accomplice is one "who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state." *Cocke v. State*, 201

S.W.3d 744, 748 (Tex. Crim. App. 2006); *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). To be considered an accomplice, the witness must have affirmatively acted to promote the commission of the offense with which the defendant is charged. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011); *Cocke*, 201 S.W.3d at 748. That is, evidence must exist connecting the alleged accomplice to the offense as a "blameworthy participant." *Cocke*, 201 S.W.3d at 748. The question of whether the alleged accomplice was actually charged or prosecuted for her participation is irrelevant to the determination of accomplice status. *Id.* Mere presence at a crime scene does not make the person an accomplice. *Id.* Further, one is not an accomplice "if the person knew about the offense and failed to disclose it or helped the accused conceal it." *Smith*, 332 S.W.3d at 439; *see also Gamez v. State*, 737 S.W.3d 315, 322 (Tex. Crim. App. 1987).

"A proper accomplice-witness instruction informs the jury either that a witness is an accomplice as a matter of law or that [she] is an accomplice as a matter of fact" with the evidence at trial dictating the type of accomplice-witness instruction to be given, if any. *Zamora*, 411 S.W.3d at 510; *see also Cocke*, 201 S.W.3d at 747–48. A witness is an accomplice as a matter of law if the witness is susceptible for prosecution for the same offense or a lesser included offense as the defendant or who implicates herself in the same offense for which the defendant is charged. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *Cocke*, 201 S.W.3d at 748. A trial court is required to give an accomplice-witness instruction if a witness is an accomplice as a matter of law. *Cocke*, 201 S.W.3d at 748. In contrast, if the parties present conflicting or unclear evidence as to whether a witness is an accomplice, the trial court may instruct the jury to determine the witness's status as a fact issue. *Id.*; *see also Smith*, 332 S.W.3d at 439–40. An accomplice-witness instruction submitted under those circumstances asks the jury to "(1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the

corroboration requirement, but only if it has first determined that the witness is an accomplice." *Zamora*, 411 S.W.3d at 510. When the evidence presented at trial clearly shows that a witness is not an accomplice, the trial court is not required to instruct the jury on the accomplice-witness rule. *Smith*, 332 S.W.3d at 440; *Gamez*, 737 S.W.2d at 322.

### 2. Analysis

Appellant argues that it was error to include an accomplice-witness instruction for Marisa but deny an instruction for Denise and Jovanna. He claims the evidence shows Denise and Jovanna were more than mere passengers in a vehicle; rather, he contends they were "active associates" of the gang before, during, and after the event. He specifically relies on evidence showing that Denise and Jovanna did nothing to report the crime, continued to socialize with these gang members well after the event, and were promised they would not be prosecuted. He maintains that because Denise and Jovanna were in the "same legal position" as Marisa, the jury should have been able to decide whether Denise and Jovanna were accomplices as a matter of fact. We disagree.

Unlike the evidence presented with respect to Marisa, who drove one of the vehicles to and from the scene of the crime, no evidence in trial record—conflicting or otherwise—suggests that Denise or Jovanna actively participated with appellant before, during, or after the commission of the assault on Jacob with the requisite culpable mental state. *See Cocke*, 201 S.W.3d at 748. Nor does the evidence suggest Denise or Jovanna acted in a manner to promote the offense with which appellant was charged. *Id.* The girls testified that when someone mentioned finding some "East Siders," they did not want to be a part of it and that they just wanted to go to a party with the group. Jovanna specifically testified she thought the guys "were just saying it" and took the statement to mean the guys wanted to argue "just like they were at the gas station." The girls did not know where they were going when they left the park, why

appellant pulled into the alley, or what was happening when everyone got out of the vehicles. When the girls got out of the Explorer, which they said was to see what was going on, the girls heard the guys yelling at the boys, saw them surround Jacob, and witnessed them hitting Jacob with bats, fists, and feet. They also saw Michael and Sergio G. chase Bobby. But the girls did not participate in the assault on Jacob, encourage the guys to harm Jacob, or provide the guys with a bat. Denise testified the assault stopped because the girls were screaming at them to leave Jacob alone. Similarly, Jovanna testified that the girls were crying. When they returned to the Explorer, they testified they wanted to stop and help Jacob but that Michael and Sergio G. made them go.

Although both girls testified they concealed their knowledge about what happened that night and did nothing to report the offense, those facts do not make them an accomplice. *See Smith*, 332 S.W.3d at 439. Nor does their presence at the scene or in the Explorer make them an accomplice to this offense. *Cocke*, 201 S.W.3d at 748. In short, there is nothing in the record before us that connects either girl to the offense as a "blameworthy participant." *Id.* We therefore conclude there is no evidence to suggest Denise or Jovanna were accomplices as a matter of law or fact and the trial court did not err in failing to instruct the jury on the accomplice-witness rule as applied to Denise and Jovanna. We overrule appellant's first point of error.

## C. Definition of "Reasonable Doubt"

Appellant contends in his second point of error that the trial court erred by including a definition of reasonable doubt in the jury charge. He specifically complains about the following language: "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt." He maintains this language constitutes a definition of "reasonable doubt" in violation of

–11–

*Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000), which stated that the better practice was to give no definition. In a subsequent decision, however, the court of criminal appeals concluded that a trial court does not abuse its discretion by giving this same instruction. *See Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010); *see also Woods v. State*, 152 S.W.3d 105, 115 (Tex. Crim. App. 2004).

This Court has previously considered this instruction and concluded it does not define "reasonable doubt." *See O'Canas v. State*, 140 S.W.3d 695, 702 (Tex. App.—Dallas 2003, pet. ref'd). In *O'Canas*, we recognized that "[w]hat constitutes proof 'beyond a reasonable doubt' is not subject to definition by the trial court because it is up to the jurors to determine whether their doubts, if any, about the defendant's guilt are reasonable." *Id.* at 701. And we said that the same wording about which appellant now complains "simply states the legally correct proposition that the prosecution's burden is to establish proof beyond a *reasonable doubt* and not *all possible* doubt." *Id.* at 702; *accord Bates v. State*, 164 S.W.3d 928, 931 (Tex. App.—Dallas 2005, no pet.); *Bratton v. State*, 156 S.W.3d 689, 695–96 (Tex. App.—Dallas 2005, pet. ref'd). Appellant acknowledges our conclusion in *O'Canas* but disagrees with it, arguing that the instant instruction "serves to demarcate one of the boundaries of reasonable doubt." For the reasons stated in *O'Canas*, however, we reject appellant's argument and conclude the jury charge did not contain error. We overrule his second point of error.

### III. Trial Court's Jurisdiction

In his third point of error, appellant contends the trial court lacked jurisdiction to hear his case and render judgment because the case was not properly transferred to the court's docket. He argues the trial court never acquired jurisdiction in this matter because the indictment was presented to the 283rd Judicial District Court, but tried in Criminal District Court No. 4, without a written transfer order. He contends that under these circumstances, it appears the 283rd

–12–

Judicial District Court retained jurisdiction under article 4.16 of the Texas Code of Criminal Procedure, and thus, the judgment rendered against him by the Criminal District Court No. 4 is void. *See* TEX. CODE CRIM. PROC. ANN. art. 4.16 (West 2005) ("When two or more courts have concurrent jurisdiction of any criminal offense, the court in which an indictment or a complaint shall first be filed shall retain jurisdiction" except as provided in article 4.12.).

In making this argument, appellant acknowledges that "authority is against his position" because the issue of a lack of a transfer order must be raised in the trial court or it is waived. (citing *Mills v. State*, 742 S.W.2d 832, 835 (Tex. App.—Dallas 1987, no pet.) and *Garcia v. State*, 901 S.W.2d 731, 732–33 (Tex. App.—Houston [14th] Dist. 1995, pet. ref'd)). We agree with that statement of the law. In situations when a transfer order is necessary, the fact that a transfer order is not contained in the record is a procedural matter, not a jurisdictional one. *Lemasurier v. State*, 91 S.W.3d 897, 899 (Tex. App.—Fort Worth 2002, pet. ref'd); *Bridwell v. State*, Nos. 05-07-00258-CR, 05-07-00259-CR, 2008 WL 467271, at *2–3 (Tex. App.—Dallas Feb. 23, 2008, no pet.). The absence of a transfer order does not render the actions of the transferee court void; rather, it subjects the court to a timely plea to the jurisdiction. *Lemasurier*, 91 S.W.3d at 899. If the defendant fails to file a timely plea to the jurisdiction, he "waives any right to complain that a transfer order does not appear in the record." *Id.*at 899–900 (quoting *Evans v. State*, 61 S.W.3d 688, 690 (Tex. App.—Fort Worth 2001, no pet.)); *Sharkey v. State*, 994 S.W.2d 417, 419 (Tex. App.—Texarkana 1999, no pet.).

Here, appellant did not file a plea to the jurisdiction or otherwise challenge the jurisdiction of Criminal District Court No. 4. Because he did not do so, he waived any error on the lack of a transfer order. *See Lemasurier*, 91 S.W.3d at 900; *Bridwell*, 2008 WL 467271, at *3. We overrule appellant's third point of error.

Having overruled appellant's points of error, we affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
Tex. R. App. P. 47

121396F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SERGIO VALENCIA, Appellant

No. 05-12-01396-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 4, Dallas County, Texas
Trial Court Cause No. F06-00598-K.
Opinion delivered by Justice Brown.
Justices O'Neill and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of March, 2014.

/Ada Brown/
ADA BROWN
JUSTICE